FILED
U.S. DISTRICT COURT

CARLIE CHRISTENSEN, United States Attorney (#0633)
CY H. CASTLE, Assistant United States Attorney (#4808)
Attorneys for the United States of America
185 South State Street, Suite 300, Salt Lake City, Utah 84111
Telephone: (801) 524-5682   Fax: (801) 325-3310

2011 SEP -2  P 1:42

DISTRICT OF UTAH

BY:_____
DEPUTY CLERK

---

### IN THE UNITED STATES DISTRICT COURT

### DISTRICT OF UTAH, CENTRAL DIVISION

---

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>APPROXIMATELY UP TO $15,034,663 IN FUNDS CONTAINED IN TEN BANK ACCOUNTS;<br><br>ALL FUNDS CONTAINED IN USAA COLLEGE SAVINGS PLANS ACCOUNT 4801 AND ACCOUNT 4802;<br><br>ALL FUNDS CONTAINED IN FIDELITY INVESTMENT ACCOUNTS 4560 AND7910;<br><br>ALL FUNDS CONTAINED IN VANGUARD ACCOUNT 1699;<br><br>NINETEEN PARCELS OF REAL PROPERTY AND IMPROVEMENTS;<br><br>ONE 2010 FORD TAURUS (VIN 1FAHP2KT0AG131915), ONE 2010 HARLEY DAVIDSON (VIN 1HD1HPH32AC803606), ONE 2002 SEA RAY MERCRUISER (SERV3186A202), ONE 2006 HUMMER H3 (VIN 5GTDN136468257156), ONE 1999 JAGUAR (VIN SAJGX2040XC040534), ONE | **SEALED**<br><br>**VERIFIED COMPLAINT FOR FORFEITURE *IN REM***<br><br>Case: 2:11cv00806<br>Assigned To : Kimball, Dale A.<br>Assign. Date : 9/2/2011<br>Description: USA v. &#036;15034663 et al |

CESSNA AIRCRAFT (SERIAL NUMBER 414A0258), ONE SEAFLOAT AIRCRAFT (SERIAL NUMBER 576);

THIRTY 10-OUNCE SILVER BARS;

SEVEN 100-OUNCE SILVER BARS;

225 ONE-OUNCE AMERICAN GOLD EAGLE COINS;

200 ONE-OUNCE SOUTH AFRICAN GOLD KRUGERRAND COINS; and

SIX FIREARMS.

Defendants.

In this in rem forfeiture action, the United States alleges:

## NATURE OF THE ACTION

1.  This is a judicial forfeiture action, as authorized by 18 U.S.C. §§ 981(a)(1)(A) and (C) and 18 U.S.C. § 984 seeking the forfeiture of defendants in rem.

2.  Defendants are properties (1) subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because they were properties, real or personal, involved in transactions or attempted transactions in violation of 18 U.S.C. §§ 1956 and 1957; or (2) subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C ) because they were properties, real or personal, that constitute or are derived from proceeds traceable to violations of §§ 666 and 1343.

## JURISDICTION AND VENUE

3.  This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1345

and 1355(a) and In Rem jurisdiction is proper by virtue of 28 U.S.C. §§ 1355(b) and (d).

4.   Venue in this Court is proper because District of Utah is the district in which any of the acts or omissions giving rise to the forfeiture occurred pursuant to 28 U.S.C. §§ 1391 and 1395 and 18 U.S.C. § 981(h).

## PARTIES

5.   Plaintiff is the United States of America.

6.   The Defendant Properties are identified as follows:

(a)   All funds and monies up to $9,679,929 in an account at Mellon Trust Bank in the name of American International Security Corporation (AISC), Account No. XXXX3588 (AISC Mellon Bank Account 3588);

(b)   All funds and monies up to $1,579,124 in an account at Bank of America (BOA) in the name of World Wide Trainers (WWT), Account No. XXXX1769 (WWT Account 1769);

(c)   All funds and monies up to $620,000 in an account at BOA in the name of Paper Mill Village, Account No. XXXX1424 (PMV Account 1424);

(d)   All funds and monies up to $88,235 in an account at BOA in the name of Welventure, Account No. XXXX1686 (Welventure Account 1686);

(e)   All funds and monies up to $500,000 contained in an account at BOA in the name of Welventure, Account No. XXXX8676 (Welventure Account 8676);

(f)   All funds and monies up to $1,299,338 contained in an account at B0A in the name of Welventure, Account No. XXXX1699 (Welventure Account 1699);

(g)   All funds and monies up to $170,000 contained in an account at BOA in the name of WWT, Account No. XXXX1764 (WTT Account 1764);

(h)   All funds and monies up to $449,250 contained in an account at BOA in the name of Hernando County Holdings (HCH), Account No. XXXX1356 (HCH Account 1356);

(I)   All funds and monies up to $18,787 contained in an account at BOA in the name of HCH, Account No. XXXX1407 (HCH Account 1407);

    (j)   All funds and monies up to $730,000 contained in an account at BOA in the name f Welventure, Account No. XXXX1757 (Welventure Account 1757);

    (k)   All funds and monies contained in USAA College Savings Plan, Account No. XXXXXXX4801 (College Saving Plan 1);

    (l)   All funds and monies contained in USAA College Savings Plan, Account No. XXXXXXX48.02 (College Saving Plan 2);

    (m)  All funds and monies contained in Fidelity Investments, TOD Individual and Self-Employed 401(k), Account No. XXX-XX4560, Self-Employed 401(k) (Fidelity Account 4560) of Christopher Harris;

    (n)   All funds and monies contained in Fidelity Investments Account No. XXX-XX7910 (Fidelity Account 7910), of Christopher Harris;

    (o)   All funds and monies contained in Vanguard Group, Account No. XXXX-XXXXXXX1699 (Vanguard Account), of Christopher Harris;

    (p)   45 Pleasant Street, Alstead, New Hampshire (PMV Property);

    (q)   3005 Maverick Drive, Lake Havasu City, Arizona (Maverick Property);

    (r)   1149 West 2320 South, St. George, Utah (St. George Property);

    (s)   1424 West Summer Poppy Drive, St. George, Utah (Poppy Property);

    (t)   Lot 16 Tonaquint Terrace located at 1200 West 2320 South, St. George, Utah

    (u)   3511 Casa Court, Hernando Beach, Florida (Casa Court Property);

    (v)   4004 Centavo Court, Hernando Beach, Florida (Centavo Property);

    (w)   4072 Pine Dale Court, Hernando Beach, Florida (Pine Dale Property #1);

    (x)   4483 Flounder Drive, Hernando Beach, Florida (Flounder Property);

    (y)   4115 Des Prez Court, Hernando Beach, Florida (Des Prez Property);

    (z)   4054 Flamingo Blvd, Hernando Beach, Florida (Flamingo Property);

(aa)  3174 Gulf Winds Circle, Spring Hill, Florida (Gulf Winds Property #1);

(bb)  3371 Gulf Winds Circle, Hernando Beach, Florida (Gulf Winds Property #2);

(cc)  3312 Gulfview Drive, Hernando Beach, Florida (Gulf View Property #1);

(dd)  3166 Gulf View Drive, Hernando Beach, Florida (Gulf View Property #2);

(ee)  7332 Grand Blvd, New Port Richey, Florida (Grand Property);

(ff)  3223 Hibiscus Drive, Hernando Beach, Florida (Hibiscus Property);

(gg)  3339 Gulf Winds Circle, Hernando Beach, Florida (Gulf Winds Property #3);

(hh)  4104 Pine Dale Court, Hernando Beach, Florida (Pine Dale Property #2);

(ii)  One 2010 Ford Taurus SHO Sedan, AWD, VIN 1FAHP2KT0AG131915;.

(jj)  One 2010 Harley Davidson, VIN 1HD1HPH32AC803606, Model VROD;

(kk)  One 2006 Hummer H3, VIN 5GTDN136468257156;

(ll)  One 2002 Sea Ray Mercruiser, SERV3186A202, Title 87282109;

(mm)  One 1999 Jaguar VIN SAJGX2040XC040534;

(nn)  One Cessna Aircraft, Model 414A, Serial Number 414A0258, Year 1979 N23RH;

(oo)  One Seafloat Aircraft, Make: Lake, Model: LA-4-200, Serial Number 576, Registration Number 16RC;

(pp)  Thirty 10 ounce silver bars;

(qq)  Seven 100 ounce silver bars;

(rr)  225 one-ounce American Eagle Gold coins;

(ss)  200 one-ounce South African Gold Krugerrand coins;

(tt)  One Heckler & Koch model USP45, .45 caliber pistol, Serial Number: 29-087108;

(uu)     One Glock model 36, .45 caliber pistol, Serial Number: PKS666;

(vv) One Smith & Wesson model M&P 15-22, .22 caliber pistol, Serial Number: DUM9146;

(ww)     One HS Products model XDM, .45 caliber pistol, Serial Number: MG514869;

(xx)     One Colt model Gold Cup, .45 caliber pistol, Serial Number: GCT25888;

(yy)     One MAC-10 45 ACP Gun, Serial Number: Unknown;

7.   The defendant real properties have not been seized.  The United States does not request authority from the court to seize the defendant real properties at this time, the united states will, as provided by 18 U.S.C. §§ 985(b)(1) and (c)(1):

a.     post notice of the action and a copy of the Complaint on the defendant real properties after the case has been unsealed;

b.     serve notice of this action on the names in which the defendant real properties are titled, and any other person or entity who may claim an interest to the defendant, along with a copy of this Complaint after this case has been unsealed;

c.     execute writs of entry for purposes of conducting an inspection and inventory of the defendant real properties;

d.     file a *lis pendens* in county records of the defendant real properties' status as a defendant in this *in rem* action.

## RELEVANT PERSONS AND ENTITIES

Christopher Harris

8.  Harris joined the United States Army in July 1985 and served in various capacities until

May 2011 when he left the military. He served on active duty, in the Maryland Army National Guard, the Army Reserves, and the West Virginia Army National Guard. He was a Special Forces Communication Sergeant in the Army. From November 2002 to June 2003, Harris was deployed to Iraq with a Special Forces unit.

9. Harris does business under the name of Harris and Associates. It is not registered in any state as a separate entity from Harris.

10. Harris lived in St. George, Utah from April 2008 to on or about March 2010.

David Young.

11. From 2007 through 2009, David Young served in Afghanistan as a Lieutenant Colonel with the United States Army. He was an activated Army reservist, serving as Director of the Combined Joint Special Operations Task Force – Afghanistan (CJSOTF-A). Young's responsibilities included the oversight of all coordination between various Army divisions in Afghanistan, including CJSOTF-A and the Combined Security Transition Command - Afghanistan (CSTC-A), including those of Major Todd Cox. Young left the military in May 2010. Young was also deployed with a Special Forces unit in Iraq at the same time Harris was deployed. 1

12. Prior to 2007, Harris and Young knew each other and communicated regularly with each other. In 2009, Harris sent three checks totaling $149,999.94 to the law firm of Evan Fray-Witzer for Young.

Todd Cox

13. Major Todd Cox was the Deputy Commander of the CSTC-A and responsible for

overseeing the transition of turning over security duties to the Afghani.

<u>Michael Taylor</u>

14. Michael Taylor is the 100 percent shareholder, president and director of AISC. AISC was

formed in 1994 in Massachusetts as a security company and is headquartered out of Boston.

<u>Tory Milos</u>

15. Milos is a captain in the New York Air National Guard. In August 2007, she was

deployed to Afghanistan and became a Contracting Officer Representative for approving invoices

for work performed by contractors for the Army.

16. Prior to being deployed to Afghanistan, Milos had a romantic relationship with Young.

Both were assigned by the military to Washington, D.C., from May 2006 to January 2007.

<u>Richard Brothers</u>

17. Richard Brothers is a business partner with David Young in Paper Mill Village located in

the state of New Hampshire. It was incorporated in 1998 to build and manage an apartment

complex for senior citizens. They are both owners of PMV. In the 2007, Young was identified

as the vice president and director of PMV while Richard Brothers was the president and director.

Brenda Elias and David Young were listed as members of the board of directors of PMV in 2010.

18. Young, together with Brothers, has played an active role in the management of the

business affairs of PMV.

19. From April 8, 2008 to July 14, 2008, Milos received three payments from Richard

Brothers. One payment referenced Paper Mill Village, and another referenced "PMV". The total

she received from Brothers was $18,000.

World Wide Trainers.

20. WWT was incorporated in the state of Massachusetts in October 2008. WWT was set up to be a clearing house and headhunter for candidates qualified to fulfill Army contracts. WWT ostensibly worked as a subcontractor for AISC. Pasquale Sperlongano and Charles Velesaris are identified as the managers of WWT.

21. While Sperlongano and Velesaris are listed as managers of WWT, Young has played an active role in the management of WWT. He has received hundreds of thousands of dollars directly and indirectly from WWT. WTT has also sent money to two of Young's girlfriends, Tory Milos and Ashley Speck. Young directed activities of WWT by email and deposited cash to WWT accounts.

22. In 2008, Harris sent $90,000 to WWT to be sent to Evan Fraye-Witzer for legal fees of Young.

Welventure

23. Welventure was registered as a limited liability corporation on May 28, 2009 in Virginia. The directors of the business were listed as Rebecca Brothers and Pasquale Sperlongano. Rebecca Brothers is the wife of Richard Brothers. Sperlongano is also associated with WWT and HCH.

24. On January 6, 2011, Welventure LLC was registered in Florida. The directors for the business were listed as Charles Velesaris, R. Stephen Brothers and Ashley Speck. Welventure has the same business address as WWT. The addresses listed on the Florida documents for Speck and Brothers are properties in the name of Hernando County Holdings, LLC (HCH).

25. From the beginning, Young has been involved in the business affairs of Welventure. He is on one of the signature cards for one of the accounts of Welventure and identified as the team leader. Young has also been in frequent contact with Velesaris and Sperlongano to discuss the movement of money between WWT accounts and Welventure accounts. Young has admitted that Welventure is just a shell.

26. Between 2009 and 2011, Young has received $326,187 from Welventure accounts.

Carol Spada

27. Carol Spada is a business associate of David Young in HCH. Before he left the military, Young identified his home address as 3223 Hibiscus Drive, Hernando Beach, Florida. This property is titled in the name of Spada and at the time was the business address of HCH.

Brenda Elias

28. Brenda Elias is also a business associate of David Young in HCH and PMV.

Hernando County Holdings

29. HCH was formed in the state of Florida on March 10, 2009. Spada was originally identified as the sole manager in the articles of organization filed with Florida Department of State. Brenda Elias was added as a manager of HCH in July 2009. The 2010 annual report states that Spada and Elias are the only managers of HCH.

30. However, Young is listed as the manager/director of HCH on its Bank of America bank account XXXX1421. Young also signed the signature card for the bank account. He is listed as the contact person on the local Chamber of Commerce website.

31. Young has also been actively involved in the business affairs of HCH since its formation,

negotiating the purchase and management of some thirteen properties. Young further claims to

be the business manager of HCH with a salary of $120,000 and lists the employees of HCH as

Tory Milos, Richard Brothers, Charles Velesaris, Brenda Elias, William Constant, Carol Spada

and Pasquale Sperlongano.

32. Young currently lists 3174 Gulf Winds Circle, Hernando, Beach, Florida, as his home

address, a property in the name of HCH. This address is also identified recently as the business

address for HCH.

## FACTS SUPPORTING FORFEITURE

The Fraud Scheme

33. In 2010, Defense Criminal Investigative Service and Homeland Security Investigations

began an investigation of Harris because they had become aware he had structured $238,400 of

withdrawals from his America First Credit Union and Chase Bank accounts from April 13, 2009

to October 1, 2010. According to witness interviews, Harris said he could not withdraw more

than $10,000 at a time because the government would know about the transactions.

34. Law enforcement's review of four different financial institutions showed that Christopher

which are incorporated by reference Harris of St. George, Utah, was responsible for

approximately $24 million in transactions in his personal financial accounts.

35. The initial information disclosed transactions that included multiple transfers of large

sums of money between several bank accounts belonging to Harris, as well as large amounts of

firearm purchases on Harris's credit cards. All of the accounts involved in this activity were

personal savings, checking, financial, or credit card accounts belonging to Harris.

36. The investigation disclosed a widespread scheme to defraud the government.

37. On June 9, 2007, the U.S. Army issued a solicitation for bids for work to be performed in Afghanistan.  The contract was a firm fixed price contract.  It was for a period of six months, and required the contractor to provide two weapons maintenance trainers/mentors, one property book trainer/mentor and one interpreter.  The terms of the contract essentially required the contractor to train Afghani Army Special Forces Commando teams on how to manage and maintain their equipment and supplies, and to also manage the equipment for the Afghanis.

38. As part of scheme to defraud the government, Young and Cox established a grossly inflated official estimate for the price of services to be performed under the proposed CSTC-A contract.  Young was instrumental in developing the CSTC-A contract.  As part of their conspiracy, Harris was to be the Country Manager for the contract and Young was to arrange for AISC to be awarded the contract.

39. Acting in their official capacities, Young and Cox conspired together to establish a grossly inflated official estimate for the price of services to be performed under the proposed CSTC-A contract.  Major Cox determined that price estimate for the contract would be $875,000 plus "a little more" money for being "close to the fight", and for the living conditions.

40. Young, with the aid of co-conspirators, including Harris and others, secretly disclosed this fraudulent price estimate to AISC in arranging for AISC to be awarded the contract.

41. As part of the scheme to defraud, Cox was involved in participating in approving the CSTC-A contract as a limited bid contract and identifying it as urgent, therefore, exempting it from going through an open bid process.

42. Because it was a limited bid contract, Cox provided the contracting officer, Captain Christopher Marquis, with a list of nine possible companies to perform the work. Of the nine contract companies, only two were successfully contacted: SOC-SMG and AISC. SOC-SMG declined to bid because it did not have a current security license for Afghanistan and the time frame was too short to put together a viable bid. Of the remaining companies, three were not eligible for the award because they were foreign owned, and three did not have the correct contact information provided by Cox. As part of the fraud scheme, Cox provided limited competing qualified candidates to the contracting officer, who was a junior officer.

43. AISC was one of two companies bidding on the requested contract. AISC's bid was in the amount of $899,782. Procurement Services International (PSI), the other bidder, placed a bid in the amount of $382,590. The discrepancy in the bids is indicative of an inflated and false government estimate.

44. On July 4, 2007, Marquis, contracting officer, sent an e-mail to Cox and Young requesting an explanation of how they arrived at their estimate for this contract. Cox replied to the e-mail with a copy to Young, indicating they estimated a cost of $875,000, with possibly a "little more" for the location of the work to be performed and the living conditions. In Cox's e-mail, he wrote, "The Estimated rate utilized by the J8 for MPRI (Highly Skilled) labor is $350,000 per man year…" J8 is a military directorate in the Middle-East that handles resource and financial issues. J8 personnel in Afghanistan were interviewed by Army CID, but had no knowledge of the labor rates referenced in Cox's e-mail.

45. On July 5, 2007, the U.S. Army awarded the CSTC-A contract to AISC, and Michael

Taylor signed the contract as the president of AISC. The amount of the contract award was

$899,781.95, which was just five cents less than the amount of AISC's bid of $899,782.00. The

relationship between the almost identical bid amount and the price estimate are indicative of an

unauthorized disclosure of the government's price estimate to AISC.

46. Young knew the price estimate, was in a position to disclose the price estimate, and had

previous personal contact with Harris, who was designated as the "Country Manager" for AISC

in its bid.

47. According to e-mails exchanged between Harris and Young, Young knew and

communicated with Harris before the CSTC-A contract was awarded to AISC and before Harris

became AISC's "Country Manager" for Afghanistan.

48. Michael Taylor of AISC submitted a bid for the contract of $899,782 and PSI a bid of

$382,590. AISC was awarded the initial contract on July 5, 2007. Taylor signed the contract as

the president of AISC. Because AISC knew the estimated contract cost, its bid amount was

virtually identical to the estimated contract price. The value of this contract was $26,21,467.84.

Cox sat on the source committee that selected AISC's contract bid.

49. Marquis prepared a Determination of Price Reasonableness Memorandum for the contract

file, indicating that the award would be slightly lower than $1 millon for six months of service

and determined the price for this acquisition was reasonable on the basis of independent

government estimates.

50. The contract was modified nine times between July 5, 2007 and August 8, 2009. After

the initial contract expired in August 2009, AISC was subsequently awarded four new

consecutive contracts for the same work to be performed through December 15, 2010 for a total value of $53,558,955.60 because the contract had become a sole source contract and AISC was already the incumbent contractor. The scope of the contracts and number of required personnel increased over time. Christopher Harris was listed in each of these contracts as the Country Manager for AISC.

51. The following chart details the value of each of the CSTC-A contracts awarded to AISC by the Army:

| Contract Number | Award Date | Total Contract Value |
|---|---|---|
| W91B4M-07-C-0007 | July 5, 2007 | $26,217,467.84 |
| W91B4M-09-P-0614 | July 11, 2009 | $5,008,123.44 |
| W91B4P-10-C-0001 | October 16, 2009 | $13,020,117.44 |
| W91B4M-10-C-0056 | June 16, 2010 | $6,773,497.92 |
| W91B4M-11-C-0002 | October 15, 2010 | $2,539,748.96 |
| | | |
| **Total Contract Value:** | | **$53,558,955.60** |

52. Throughout the duration of the contracts, AISC failed to have the staffing of personnel in Afghanistan as required by the contract. However, Young, Harris, Taylor and others conspired to bill the government for the full price of the contracts by obtaining the participation of other Army personnel to fraudulently verify that AICS was fully performing. This resulted in a financial windfall for AISC.

53. Tory Milos was responsible for verifying that the work on the contract was being completed. She approved AISC's vouchers, which in turn, authorized payments to AISC under the contracts.

54. From on or about November 16, 2007, through on or about January 13, 2011, the government deposited approximately $53,976,645 into AISC Mellon Bank Account 3588. Throughout the duration of the contracts, AISC filed false Form 1099s with the IRS, which failed to accurately report the actual amount paid to Harris. For example, in 2007, AISC paid Harris $232,490 but filed a Form 1099 showing payments to Harris and Associates in the amount of $143,273. In 2008, AISC paid Harris $3,571,559 but filed a Form 1099 in the name of Harris and Associates for payments of $3,229,696. In 2009, AISC paid Harris almost $7.3 million, but filed a Form 1099 for 2009 for payments to Harris and Associates for only $1 million. In 2010, AISC paid Harris more than $5.7 million but AISC has failed report the payments to the IRS.

55. As part of its continuing effort to conceal its fraudulent contract, AISC reported its total payments on its 1099s was $8,983,853, but the total "outside services" that AISC claimed as an expense on its 2009 tax return was $16,796,894, a difference of over $7.8 million.

56. AISC included the total amounts paid to Harris as part of the "outside services" expense but falsified the 1099 paid to Harris by reducing it by nearly $6.3 million in order to conceal the fact that Harris was getting paid such a significant amount through their fraudulent conduct.

57. In 2010, Harris received over $5,734,343 from AISC, yet AISC did not report to the IRS that they had paid any money to Harris or to Harris and Associates, again in an attempt to conceal the large amounts of money Harris was paid through their fraudulent conduct.

58. In an effort to conceal the amount of money he has obtained through his fraudulent conduct, Harris has not filed any federal income tax returns for the years 2008, 2009 and 2010.

59. AISC reported net profits on their tax returns of $275,762 in 2007, $2,148,158 in 2008 and $4,242,421 in 2009 (AISC has not filed a 2010 tax return). In 2008 and 2009 Harris was paid significantly more than the total net profits reported for the whole company of AISC.

60. At the direction of Harris, and as part of the conspiracy, AISC also wire transferred $1,579,125 to WWT Account 1769.

Money Laundering Scheme

61. As part of their conspiracy, Young, Harris, Taylor and others have used approximately 115 bank accounts to conceal and disguise the nature, source, location, ownership and control of the proceeds in violation of 18 U.S.C. § 1956; and to spend the criminal proceeds of the contract in violation of 18 U.S.C. § 1957.

62. A portion of the $53.9 million was used to cover expenses incurred by AISC in performance of the contracted services. However, from November 26, 2007 to October 28, 2010, AISC, as part of the conspiracy, made thirty-seven electronic fund transfers in amounts over $10,000 from AISC Mellon Bank Account 3588 of more than $17.4 million to Christopher Harris's personal checking account at USAA Savings Bank, Account No. XXXX4862 (USAA Account 4862) in violation of 18 U.S.C. § 1957.

63. In an effort to conceal the nature, source, location, ownership and control of the contract proceeds, the funds received by Harris from AISC's bank accounts were then distributed by Harris through a web of complicated wire transfers to various bank accounts for the ultimate personal benefit of Young, Harris, Cox and others. **See Attachment A**, entitled Summary Flow Chart A,

and **Attachment B**, entitled Summary Flow Chart B, which are incorporated by reference, graphically illustrating these financial transfers.

64. Payments from the government to AISC and from AISC to Harris show that AISC often paid Harris within 1 to 2 weeks of receiving payments from the government. AISC paid Harris approximately 32% of the total payments that the company received from the government. From October 4, 2007 to November 2, 2010, Harris only received less than $20,000 in deposits into his USAA Federal Savings Bank checking account from sources other than AISC. Approximately 99.9% of the deposits into this account originated from AISC.

65. Harris moved part of the $17.4 million from his account at USAA to his accounts at America First Credit Union (AFCU) in St. George, Utah and Chase Bank in Lake Havasu, Arizona. After transferring the money to AFCU and Chase, Harris then withdrew cash from the accounts on numerous occasions for his personal use in amounts just below the cash transaction reporting threshold of $10,000 (commonly referred to as *structuring*). Harris made a total of $238,400 in structured cash withdrawals from AFCU and Chase Bank from April 13, 2009 to October 1, 2010.

66. On October 1, 2010, bank teller Trent Mitchell of AFCU asked Harris why he frequently and consistently withdrew $9,000 at a time, and Harris replied that the government would know about any withdrawals over $10,000.

67. As part of the efforts to layer the proceeds of the fraud scheme, in order to disguise the true nature, source and location of the proceeds, from on or about December 2007 to on or about April 2008, Harris wire transferred approximately $401,535 from his USAA Account 4862 to the

personal account at BOA in the name of Richard Brothers, Account No 2344 (Brothers Account). Of the $401,535, $236,390 of the funds was used to pay off an existing mortgage on the PMV Property owed to Connecticut River Bank.

68. After February 23, 2011, and as part of the conspiracy, WWT also transferred $500,000 from WWT Account 1769 to PMV Account 1424.

69. In addition, from on or about June 2008 to on or about August 2009, Harris wire transferred approximately $2,095,048 from his USAA Account 4862 into an account at BOA in the name of Carol Spada and Brenda Elias, Account No. XXXX4607 (Spada Account 4607) in violation of 18 U.S.C. §§ 1956 and 1957. The $2,095,048 was the only money deposited into Spada Account 4607. A large portion of this money was used to purchase thirteen homes in the name of HCH and one home in the name of Spada. Spada and Elias were named as managers of HCH. However, Young is the true owner and manager of HCH.

70. After Spada Account 4607 received $2,095,048, $500,000 was wire transferred to an account at BOA in the name of Carol Spada and Brenda Elias, Account No. XXXX8193 (Spada Account 8193) on August 14, 2009. No other money was deposited into this account.

71. After Spada Account 4607 received $2,095,048, $435,466 was wire transferred to an account at BOA in the name of Carol Spada and Brenda Elias, Account No. XXXX0338 (Spada Account 0338) from on or about October 2007 to on or about October 2010.

72. WWT functioned ostensibly as a subcontractor for AISC to recruit and provide personnel to AISC to perform the services the contract required. Though not listed on public documents as

officer, director or owner of WWT, Young has played an active role in WWT's business affairs and received hundreds of thousands of dollars directly or indirectly from WWT.

73. Harris wire transferred approximately $5,014,799 from his USAA Account 4862 to an account at BOA in the name of WWT, Account No. XXXX8693 (WWT Account 8693) during the period from on or about October 2009 to on or about November 2010.

74. Money deposited into WWT Account 8693 from Harris was then transferred to numerous other WWT and Welventure Bank of America accounts.

75. On or about February 22, 2011, AISC wire transferred approximately $1,579,125 from AISC Mellon Bank Account 3588 to WTT Account 1769.

76. All the money WWT has received has come from either Harris or AISC and has been criminal proceeds derived from the fraud scheme and conspiracy of Young, Harris, Taylor, Cox and Milos in violation of 18 U.S.C. §§ 666, 1344 and 287.

77. As part of the conspiracy, WWT transferred more than $5 million to multiple Bank of America accounts in the name of Welventure, Inc. and Welventure, LLC.

78. In turn, Welventure transferred hundreds of thousands of dollars among numerous Welventure Bank of America accounts. These accounts have had no evident commercial purpose other than to launder the criminal proceeds from one account to another it has received from WWT.

79. On May 2, 2011 and May 10, 2011, Todd Cox received two wire transfers in the amount of $8,000 each, for a total of $16,000, from Welventure Account 1686.

## FINANCIAL TRACING OF FRAUD PROCEEDS

80. Young, Harris, Taylor and others used numerous bank accounts and various shell companies to launder the proceeds of their fraud scheme by redistributing the funds and layering the proceeds through sometimes convoluted transactions in order to conceal and disguise the , location, source, ownership and control of the fraud proceeds.

### TEN BANK ACCOUNTS

### AISC Mellon Bank Account 3588.

81. From on or about September 19, 2010 through on or about January 13, 2011, AISC Mellon Bank Account 3588 received deposits in the form of electronic wire transfers from the government of $9,679,929. All of the deposits from the government constituted proceeds attributable to the fraud scheme.

### WWT Account 1769.

82. On or about February 4, 2011, WWT Account 1769 received a deposit in the form of electronic wire transfers from AISC Mellon Bank Account 3588 in the amount of $1,579,124. Law enforcement's analysis of the bank records concluded that this transfer was the proceeds of the fraud scheme.

### PMV Account 1424.

83. On or about November 24, 2010, PMV Account 1424 received fraud proceeds in the form of electronic wire transfer from Welventure Bank of America Account XXXX8695 (Welventure Account 8695) in the amount of $20,000.

84. On or about March 2, 2011, PMV Account 1424 received a deposit in the form of an

electronic wire transfer from Welventure Account 1699 in the amount of $100,000.

85. On or about March 8, 2011, PMV Account 1424 received a deposit in the form of an electronic wire transfer from WWT Account 1769 in the amount of $500,000.

86. Law Enforcement's analysis of the bank records concluded that the transfers totaling $620,000 were proceeds attributable to the fraud scheme.

**Welventure Account 1686.**

87. On or about February 4, 2011, Welventure Account 1686 received a deposit in the form of an electronic wire transfer from Welventure Account 8676 of $78,235.

88. Additionally, on or about May 2, 2011, Welventure Account 1686 received a deposit in the form of an electronic wire transfer from Welventure Account 1699 of $10,000.

89. Law enforcement's analysis of the bank records concluded that the transfers totaling $88,235 were the proceeds of the fraud scheme.

**Welventure Account 8676.**

90. During the period from on or about September 16, 2010, to on or about October 7, 2010, Welventure Account 8676 received fraud proceeds in the form of electronic wire transfers from Welventure Bank of America Account XXXX8690 (Welventure Account 8690) in the amount of $110,000 and Welventure Account 8695 in the amount of $390,000.  Law enforcement's analysis of the bank records concluded that the transfers totaling $500,000 were the proceeds of the fraud scheme.

**Welventure Account 1699.**

91. On or February 4, 2011, Welventure Account 1699 received a deposit in the form of an

electronic wire transfer from Welventure Bank of America Account 8695 in the amount of $124,338.

92. Beginning on or about February 28, 2011 to on or about March, 8, 2011, Welventure Account 1699 received three deposits in the form of electronic wire transfers from WWT Account 1769 in the amount of $675,000.

93. On or about March 8, 2011, Welventure Account 1699 received a deposit in the form of electronic wire transfer from PMV Account 1424 in the amount of $500,000.

94. Law enforcement's analysis of the bank records concluded that the transfers totaling $1,299,338 were proceeds of the fraud scheme.

**WWT Account 1764.**

95. On or about February 4, 2011, $170,000 was wire transferred from WWT Bank of America Account XXXX8711 to WWT Account 1764. Law enforcement's analysis of the bank records concluded that the transfer of $170,000 was proceeds of the fraud scheme.

**HCH Account 1356.**

96. During the period from on or about September 16, 2010, to on or about January 27, 2011, HCH Account 1356 received deposits in the form of electronic wire transfers from Welventure Account 8676 and Welventure Bank of America Account 8695 in the amount of $291,250.

97. During the period from February 28, 2011 and May 31, 2011, HCH Account 1356 received deposits in the form of electronic wire transfers from Welventure Account 1699 in the amount of $158,000. Law enforcement's analysis of the bank records concluded that the transfers totaling $449,250 were proceeds of the fraud scheme.

**HCH Account 1407.**

98. During the period from on or about September 16, 2010, to on or about April 8, 2011, HCH Account 1407 received deposits in the form of electronic wire transfers from HCH Account 1356 in the amount of $18,787. Law enforcement's analysis of the bank records concluded that the transfers totaling $18,787 were proceeds of the fraud scheme.

**Welventure Account 1757.**

99. On or about February 4, 2011, Welventure Account 1757 received a deposit in the form of an electronic wire transfer from WWT Bank of America Account XXXX8735 in the amount of $330,000.

100. On or about February 28, 2011, Welventure Account 1757 received one deposit in the form of electronic wire transfers from WWT Account 1769 in the amount of $400,000.

101. Law enforcement's analysis of the bank records concluded that the transfers totaling $730,000 were proceeds of the fraud scheme.

**INVESTMENT ACCOUNTS**

**College Savings Plan 1.**

102. Harris opened College Savings Plan 1 on or about December 1, 2007 for the benefit of C.E.H. The balance as of September 30, 2010 was $42,066. From on or about December 3, 2007 to on or about September 30, 2010, Harris wire transferred $34,100 from his USAA Account 4862 into this account. These funds constituted traceable fraud proceeds and property involved in, or traceable to property involved in, money laundering.

**College Savings Plan 2.**

103. Harris opened College Savings Plan 2 on or about December 4, 2007 for the benefit of C. R. H. The balance in the account as of September 30, 2010 was $30,947. From December 4, 2007 to September 30, 2010, Harris transferred from his USAA Account 4862 $24,550 into this accounts. These funds constituted traceable fraud proceeds and property involved in, or traceable to property involved in, money laundering.

**Fidelity Account 4560.**

104. On or about March 31, 2004, Harris opened Fidelity Account 4560 as Christopher R. Harris, dba Harris & Associates. The account balance as of December 31, 2010 was approximately $149,603. From April 14, 2008 to March 13, 2009 there was approximately $94,500 of deposits into Fidelity Account 4560 from USAA Account 4862. These funds constituted traceable fraud proceeds and property involved in, or traceable to property involved in, money laundering

**Fidelity Account 7910**

105. On or about March 7, 2005, Harris opened Fidelity Account 7910 as Christopher R. T. Harris. The account balance as of November 30, 2010 was approximately $18,256. From April 22, 2008 to October 3, 2008 there were approximately $34,075 of deposits into Fidelity Account 7910 from USAA Account 4862. These funds constituted traceable fraud proceeds and property involved in, or traceable to property involved in, money laundering.

**Vanguard Account.**

106. On or about October 17, 2004, Christopher Harris opened an account with Vanguard. The ending balance as March 31, 2011 was approximately $103,996. From on or about December

5, 2007 to on or about March 22, 2010, Harris transferred from his USAA Account 4862 approximately $64,500 into his Vanguard Account in violation of 18 U.S.C. §1956. These funds constituted traceable fraud proceeds and property involved in, or traceable to property involved in, money laundering.

## NINETEEN PARCELS OF PROPERTY

**Mortgage on PMV Property.**

107.    From December 2007 to April 2008, Harris sent Brothers $401,534 from USAA Account 4862. The money from Harris was deposited into Brothers Account. In turn, Brothers used $236,390 of the funds to pay off an existing mortgage on the PMV Property owed to Connecticut River Bank. An analysis of the funds used to pay off the mortgage constitute traceable fraud proceeds and property involved in, or traceable to property involved in, money laundering.

**Maverick Property**

108.    On April 1, 2010, Harris purchased the real property located at 3005 Maverick Drive, Lake Havasu City, Arizona for $252,000. He accomplished the purchase by sending a wire transfer from his USAA Account 4862 to Stewart Title on March 30, 2010. An analysis of the funds used to purchase the Maverick Drive property constitute traceable fraud proceeds and property involved in, or traceable to property involved in, money laundering.

109.    After the purchase, Harris wrote the following checks to John Hill Construction for the Maverick Drive property from his USAA Account 4862: check 2543 for $100,000 on May 24, 2010; check 2548 for $100,000 on June 10, 2010; check #2554 for $16,361 on August 9, 2010;

and check #2708 for $36,049. An analysis of the checks paid to John Hill Construction constitute

traceable fraud proceeds and property involved in, or traceable to property involved in, money

laundering.

110. Harris also wrote from his USAA Account 4862 check 2540 to Oasis Tile for $20,000

on May 14, 2010 and check 2549 to Oasis Floors for $15,728 on June 30, 2010 for the Maverick

Drive property. An analysis of the checks paid to Oasis Tile and Oasis Floors constitute traceable

fraud proceeds and property involved in, or traceable to property involved in, money laundering.

111. He also wrote from his USAA Account 4862 check 2545 on June 3, 2010 for $20,000

and check 995232 for $18,458 on June 4, 2010 to Mohave Solar for solar improvements for the

Maverick Drive property. An analysis of the checks paid to Mohave Solar constitute traceable

fraud proceeds and property involved in, or traceable to property involved in, money laundering.

**St. George Property**

112. On or about August 1, 2008, Christopher Harris and Trissie K. Cox purchased a home

at 1149 West 2320 South, St. George, Utah for a purchase price of $380,000. Harris paid the

$380,000 by wire transferring $225,000 from his USAA Account 4862 to the bank account of

Southern Utah and obtaining a loan for approximately $155,000. The St. George Property is in

the name of the Trissie K. Cox-Harris Trust. An analysis of the funds used to purchase the

property constitute traceable fraud proceeds and property involved in, or traceable to property

involved in, money laundering.

**Poppy Property.**

113. On or about August 1, 2008, Christopher Harris and Trissie K. Cox purchased a home

at 1424 West Summer Poppy Drive, St. George, Utah for a purchase price of $200,000. On or about July 29, 2008, Harris wire transferred $199,020 from his USAA Account 4862 to the account of Southern Utah Title for the purchase. The Poppy Property is in the name of the Trissie Cox-Harris. An analysis of the funds used to purchase the property constitute traceable fraud proceeds and property involved in, or traceable to property involved in, money laundering.

**Tonaquint Terrace St. George Lot**

114.    On May 7, 2009, Harris wired $80,000 from his USAA Account 4862 to Atlas Title for the purchase of the building lot referred to as Lot 16 Tonaquint Terrace, located at 1200 West 2320 South, St. George, Utah. An analysis of the funds used to purchase the real property constitute traceable fraud proceeds and property involved in, or traceable to property involved in, money laundering.

**<u>Hernando County Properties</u>**

**Casa Property.**

115.    On April 14, 2009, HCH purchased the Casa Property for $173,000 with a down payment of approximately $10,000. The down payment of $10,000 came from Spada Account 0338. The payment of $162,271 came from HCH Regions Bank Account XXXX2267 (HCH Regions Account). An analysis of all the funds used to purchase the real property constitute traceable fraud proceeds and property involved in, or traceable to property involved in, money laundering.

**Centavo Property.**

116.    On July 23, 2009, HCH purchased the Centavo Property for $148,880 with a down

payment of $7,500. The down payment of $7,500 came from came from the Spada Account 0338. The remaining balance came from the payment of $141,380 came from the HCH Regions Account. An analysis of all the funds used to purchase the real property constitute traceable fraud proceeds and property involved in, or traceable to property involved in, money laundering.

**Pine Dale Property #1.**

117.    On July 27, 2009, HCH purchased the Pine Property #1 for $152,039. The payment of $155,000 came from the HCH Regions Account. An analysis of the funds used to purchase the real property constitute traceable fraud proceeds and property involved in, or traceable to property involved in, money laundering.

**Flounder Property.**

118.    On August 28, 2009, HCH purchased the Flounder Property for $148,140. The payment of $148,500 came from the HCH Regions Account. An analysis of the funds used to purchase the real property constitute traceable fraud proceeds and property involved in, or traceable to property involved in, money laundering.

**Des Prez Property.**

119.    On September 30, 2009, HCH purchased the Des Prez Property for $173,688. The payment of $175,000 came from the HCH Regions Account. An analysis of the funds used to purchase the real property constitute traceable fraud proceeds and property involved in, or traceable to property involved in, money laundering.

**Flamingo Property.**

120.    On January 5, 2010, HCH purchased the Flamingo Property for $242,099. The

payment of $249,900 came from the HCH Regions Account. An analysis of the funds used to purchase the real property constitute traceable fraud proceeds and property involved in, or traceable to property involved in, money laundering.

**Gulf Winds Property #1.**

121. On March 18, 2010, HCH purchased the Gulf Winds Property #1 for $518,502. The payment of $518,502 came from the HCH Regions Account. An analysis of the funds used to purchase the real property constitute traceable fraud proceeds and property involved in, or traceable to property involved in, money laundering.

**Gulf Winds Property #2.**

122. On May 12, 2010, HCH purchased the Gulf Winds Property #2 for $424,099. The payment of $424,099 came from the HCH Regions Account. An analysis of the funds used to purchase the real property constitute traceable fraud proceeds and property involved in, or traceable to property involved in, money laundering.

**Gulf View Property #1**

123. On June 24, 2010, HCH purchased Gulf View Property #1 for $163,081. Payment of $163,081 came from the HCH Regions Account. An analysis of the funds used to purchase the real property constitute traceable fraud proceeds and property involved in, or traceable to property involved in, money laundering.

**Gulf View Property #2**

124. On August 17, 2010, HCH purchased Gulf View Property #2 for $317,381. Payment of $317,381 came from the HCH Regions Account. An analysis of the funds used to purchase the

real property constitute traceable fraud proceeds and property involved in, or traceable to property involved in, money laundering.

**Grand Property**

125.     On February 12, 2010, HCH purchased the Grand Property for $399,671. The payment of $399,671 came from the HCH Regions Account. An analysis of the funds used to purchase the real property constitute traceable fraud proceeds and property involved in, or traceable to property involved in, money laundering.

**Hibiscus Property.**

126.     On October 9, 2010, Carol Spada and Brenda Elias purchased the Hibiscus Property for $219,554. The payment of $219,554 came from Spada Account 4607. The property is titled in the name of Carol Spada. An analysis of the funds used to purchase the real property constitute traceable fraud proceeds and property involved in, or traceable to property involved in, money laundering.

**Gulf Winds Property #3.**

127.     On August 14, 2009, HCH purchased the Gulf Winds Property #3 for $201,550, with a down payment of approximately $20,000. The down payment of $20,000 came from HCH Regions Account. The balance came from the payment of approximately $179,203 from the Spada Account 4607. The property is titled in the name of HCH. An analysis of all the funds used to purchase the real property constitute traceable fraud proceeds and property involved in, or traceable to property involved in, money laundering.

**Pine Dale Property #2**

128.    On July 27, 2009, HCH purchased the Pine Dale Property #2 for approximately $180,000, with a down payment of approximately $10,000. The down payment of $10,000 came from HCH Regions Account. The payment of approximately $172,928 came from Spada Account 8193. The property is titled in the name of HCH. An analysis of all the funds used to purchase the real property constitute traceable fraud proceeds and property involved in, or traceable to property involved in, money laundering.

**2010 Ford Taurus, VIN 1FAHP2KT0AG131915.**

129.    On or about April 5, 2010, Harris purchased a Ford Taurus for $37,170 from Overseas Military Sales Corporation. The payment came from USAA Account 4862. An analysis of the funds used to purchase the Ford Taurus constitute traceable fraud proceeds and property involved in, or traceable to property involved in, money laundering.

**Harley Davidson, VIN 1HD1HPH32AC803606**

130.    On or about April 5, 2010, Harris purchased a 2010 Harley Davidson for $17,660 from Overseas Military Sales Corporation. The payment came from Harris's USAA Account 4862. An analysis of the funds used to purchase the Harley Davidson constitute traceable fraud proceeds and property involved in, or traceable to property involved in, money laundering.

**Hummer, VIN 5GTDN136468257156**

131.    On June 23, 2009, Young bought a Hummer for $21,600. One week before the Hummer was purchased, Brenda Elias withdrew $100,000 in cash from Spada Account 4607. HCH is listed as the owner of the Hummer with the same address as the home of Young. The

cash used to purchase the Hummer constitute traceable fraud proceeds and property involved in, or traceable to property involved in, money laundering.

**Sea Ray Mercruiser, SERV3186A202**

132.     On July 9, 2009, HCH purchased a Sea Ray Mercruiser for cash. Three weeks before the boat was purchased, Brenda Elias withdrew $100,000 in cash from Spada Account 4607 from a branch located in the Hernando Beach area. The Application for Certificate of Title for the Sea Ray Mercruiser names Young as the owner, living at the Hibiscus Property. The cash used to purchase the Sea Ray Mercruiser constitute traceable fraud proceeds and property involved in, or traceable to property involved in, money laundering.

**1999 Jaguar, VIN SAJGX2040XC040534**

133.     On February 22, 2009, David Young purchased a 1997 and 1999 Jaguars for $31,058 in cash. On February 13, 2009, about one week before the Jaguar was purchased, Spada withdrew $50,000 in cash from Spada Account 4607. The 1999 Jaguar was sold in the name of HCH for $7,000 on October 7, 2010 by David Young. This vehicle is registered to HCH at 3174 Gulf Winds Circle, Hernando Beach, Florida, which is the home address for Young. The cash used to purchase the Jaguar constitute traceable fraud proceeds and property involved in, or traceable to property involved in, money laundering.

134.     One week before Young purchased the Jaguar, Spada withdrew $50,000 from Spada Account 0338. The cash used to purchase the Jaguar would constitute traceable fraud proceeds and property involved in, or traceable to property involved in, money laundering.

**Cessna Airplane, Serial Number 414A0258**

135.    On or about May 13, 2009, Harris wire transferred $311,675 from his USAA Account 4862 to AIC Title for the initial purchase of a Cessna airplane. The funds used to purchase the Cessna airplane constitute traceable fraud proceeds and property involved in, or traceable to property involved in, money laundering.

136.    In addition to the initial payment of $311,675 to AIC Title, Harris wire transferred from his USAA Account 4862 $44,637 on June 10, 2009, $20,600 on July 20, 2009 and $26,000 on November 2, 2009 to Air Impressions for the Cessna airplane.

137.    On July 7, 2009, Harris wire transferred from his USAA Account 4862 $182,120 to Ram Aircraft and $34,451 to Duncan Aviation for the Cessna airplane.

138.    Harris made two wire transfers from his USAA Account 4862 of $12,000 to Arturo Aircraft Interiors on January 19, 2010 and February 8, 2010, respectively, for the Cessna airplane.

139.    Harris made at least two wire transfers from his USAA Account 4862 to Mayday Avionics on June 23, 2009 for $70,000 and another on September 15, 2009 for $85,000 for the Cessna airplane.

140.    An analysis of the funds used to purchase and upgrade the Cessna airplane constitute traceable fraud proceeds and property involved in, or traceable to property involved in, money laundering.

**Seafloat Airplane, Serial Number 576, Registration Number 16RC**

141.    On January 27, 2011, Harris issued check no. 0000995242 for $49,000 and a second check no. 0000995243 for $31,000 from his USAA Account 4862 for the purchase of a Seafloat airplane from Air Options, LLC. An analysis of the funds used to purchase the Seafloat airplane

constitute traceable fraud proceeds and property involved in, or traceable to property involved in, money laundering.

**Thirty 10 -Ounce Silver Bars**

142.    On November 26, 2010, Harris purchased ten generic 10 ounce silver bars for $2,937. Harris purchased the ten silver bars with his MasterCard XXXXXXXX 5870 (MasterCard).  In turn, the  MasterCard purchase was paid from Harris's USAA Account 4862.

143.    On December 17, 2010, Harris purchased twenty generic 10 ounce silver bars for $6,327.  Harris purchased the twenty silver bars with Visa Credit Card XXXXXXXXXXXX0353. In turn, the Visa Credit Card was paid from Harris's USAA Account 4862.

**Seven 100 - Ounce Silver Bars**

144.    On November 29, 2010, Harris purchased one 100 ounce Silver JM Bar for $2,913. This purchase was charged to the MasterCard.  In turn, the MasterCard was paid from Harris's USAA Account 4862.

145.    On December 3, 2010, Harris purchased six name brand 100 ounce silver bar 999 for $17,835 charged through Pay Pal MasterCard.  In turn, the Pay Pal MasterCard was paid from Harris's USAA Account 4862.

146.    All the silvers bars were shipped to Harris's home at Items shipped to 3005 Maverick Drive, Lake Havasu City, Arizona.

147.    An analysis of the funds used to purchase the silver bars constitute traceable fraud proceeds and property involved in, or traceable to property involved in, money laundering.

**U.S. Gold Eagles.**

148.    On December 30, 2010, David Young purchased 225 one-ounce U.S. Gold Eagles for $332,125 from Blanchard and Company, a gold investment company in New Orleans, Louisiana. Coins were shipped to Young's home at 3174 Gulf Winds Circle, Hernando Beach, Florida.

149.    Payment to Blanchard came from a wire transfer from Welventure Account 8690. An analysis of the funds used to purchase the U.S. Gold Eagles constitute traceable fraud proceeds and property involved in, or traceable to property involved in, money laundering.

**Krugerrands.**

150.    On or about April 14, 2010 and on or about June 22, 2010, respectively, David Young purchased a total of 200 one-ounce South African Gold Krugerrands from Blanchard for $247,000. The Krugerrands were shipped to Young.

151.    Payments for the Krugerrands came from two wire transfers from WWT Bank of America Account XXXX1425: one on April 14, 2010 for $125,000 and a second on June 22, 2010 for $132,000. An analysis of the funds used to purchase the Krugerrands constitute traceable fraud proceeds and property involved in, or traceable to property involved in, money laundering.

**Six Firearms.**

152.    On or about June 22, 2010, Harris purchased a H&K model USP45 45 caliber pistol and a Glock model 36 45 caliber pistol from US Autoweapons in Scottsdale, Arizona. On June 25, 2010, there is a corresponding posted charge on Harris's America First Credit Union credit card in the amount of $6,190 made to US Autoweapons in Scottsdale, Arizona. An analysis of the

funds used to purchase the firearms constitute traceable fraud proceeds and property involved in, or traceable to property involved in, money laundering.

153.    On December 29, 2010, Harris also bought a Smith & Wesson model M&P 15-22 22 caliber pistol, a HS Products model XDM 45 caliber pistol, and a Colt model Gold Cup 45 caliber pistol from US Autoweapons in Scottsdale, Arizona.  On December 29, 2010, there is a corresponding purchase made on Harris's USAA MasterCard credit card in the amount of $3,768 to US Autoweapons.  Both of Harris's credit cards were paid using his USAA Account 4862.  An analysis of the funds used to purchase the firearms constitute traceable fraud proceeds and property involved in, or traceable to property involved in, money laundering.

154.    On May 10, 2010, Harris purchased a MAC-10 45 ACP with his USAA credit card in the amount of $4,533 from Impact guns on June 30, 2010.  The investigation has shown that Harris paid his USAA credit card with funds from his USAA Account 4862. An analysis of the funds used to purchase the firearm constitutes traceable fraud proceeds and property involved in, or traceable to property involved in, money laundering.

**FIRST CLAIM FOR RELIEF**
**18 U.S.C. § 981(a)(1)(C)**
**(forfeiture of proceeds from violations of 18 U.S.C. §§ 666 and 1344)**

155.    The United States incorporates by reference the allegations in paragraphs 1 through 154 as though fully set forth.

156.    18 U.S.C. § 981(a)(1)(C) provides, in part, for the forfeiture of any property, real or personal, which constitutes or is derived from proceeds traceable to an offense constituting a "specified unlawful activity."

157.    18 U.S.C. §§ 666 and 1343 theft or bribery concerning programs receiving federal funds and prohibit wire fraud, and any conspiracy to commit such offenses, are specified unlawful activities under 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1).

158.    In light of the foregoing, defendants (a) through (yy), listed above, are real and personal properties, involved in or traceable to a transaction or attempted transaction in violation of 18 U.S.C. §§ 666 and 1343 – theft or bribery concerning programs receiving federal funds and wire fraud, and thus subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 984.

159.    18 U.S.C. § 984 provides that identical property found in the same place or account as property involved in the violation of 18 U.S.C. §§ 666 and 1343 is subject to forfeiture, as long as the forfeiture action is commenced a year or less from the date the offenses occurred.

### SECOND CLAIM FOR RELIEF
### 18 U.S.C. § 981(a)(1)(A)
### (forfeiture of property involved in money laundering,
### in violation of 18 U.S.C. § 1956(a)(1)(B)(i))

160.    The United States incorporates by reference the allegations in paragraphs 1 through 159 as though fully set forth.

161.    Title, 18 U.S.C. § 981(a)(1)(A) provides, in part, for the forfeiture of any property, real or personal, prohibits a person from knowingly engaging or attempting to engage in a monetary transaction of property derived from a specified unlawful activity, with the intent to conceal or disguise the nature, location, source, ownership, or control the proceeds of a specified unlawful activity in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

162.    18 U.S.C. § 1956(h) prohibits any conspiracy to violate 18 U.S.C. § 1956.

163.    18 U.S.C. §§ 666 prohibits theft or bribery concerning programs receiving federal funds, 1343 prohibits wire fraud, and 1956 prohibits money laundering.  Sections 666 and 1343 are specified unlawful activities under 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1).

164.    In light of the foregoing, defendants (a) through (yy), listed above, are real and personal property that represents properties involved in or traceable to a transaction or attempted transaction in violation of 18 U.S.C. § 1956(a)(1)(B)(i) – money laundering, and are thus subject to forfeiture to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 984.

165.    18 U.S.C. § 984 provides that identical property found in the same place or account as property involved in the violation of 18 U.S.C. §§ 666 and 1343 is subject to forfeiture, as long as the forfeiture action is commenced a year or less from the date the offenses occurred.

### THIRD CLAIM FOR RELIEF
**18 U.S.C. § 981(a)(1)(A)**
**(forfeiture of property involved in money laundering,**
**in violation of 18 U.S.C. § 1957)**

166.    The United States incorporates by reference the allegations in paragraphs 1 through 165 as though fully set forth.

167.    18 U.S.C. § 981(a)(1)(A) provides, in part, for the forfeiture of any property, real or personal, prohibits a person from knowingly engaging or attempting to engage in a monetary transaction of property in violation of 18 U.S.C. § 1957.

168.    18 U.S.C. § 1957(a) prohibits a person from knowingly engaging or attempting to engage in a monetary transaction in criminally derived property that has a value greater that

$10,000 and is derived from a specified unlawful activity.

169. 18 U.S.C. § 1956(h) prohibits any conspiracy to violate 18 U.S.C. § 1956.

170. 18 U.S.C. § 666 prohibits theft or bribery concerning programs receiving federal funds and § 1343 prohibits wire fraud and § 1957 prohibits money laundering. Sections 666 and 1343 are specified unlawful activities under 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1).

171. Defendants (a) through (h), (j), (p) through (oo), (rr) and (ss), listed above, are real and personal property that represents properties involved in or traceable to a transaction or attempted transaction in violation of 18 U.S.C. § 1957 – money laundering, and thus subject to forfeiture to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 984.

172. 18 U.S.C. § 984 provides that identical property found in the same place or account as property involved in the violation of 18 U.S.C. §§ 666 and 1343 is subject to forfeiture, as long as the forfeiture action is commenced a year or less from the date the offenses occurred.

## CONCLUSION

WHEREFORE, the United States respectfully asserts that there is reasonable cause to believe defendants (a) through (yy), listed above, are forfeitable to the United States under 18 U.S.C. §§ 981(a)(1)(A) and (C) and 984 and requests:

A. That, pursuant to the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, Rule G(3)(b)(ii), the Court issue a Warrant and Summons for Arrest of Articles *In Rem* as to defendants (a) through (o), and (ii) through (yy);

B. That, pursuant to 18 U.S.C. § 985(b)(2), and 18 U.S.C. § 983(j), which permits the Court to "take any action to . . . preserve the availability of the property subject to civil

forfeiture," the Court issue the proposed Writ of Entry attached to this Complaint authorizing the Internal Revenue Service, Criminal Investigations, or its delegate, to enter the Defendant real property, including any structures, on one or more occasions during the pendency of this in rem forfeiture action:

- for the purpose of conducting an inspection and inventory and appraisal of the Defendant real property, which inspection and inventory and appraisal may include still and video photography; and

- to be accompanied on any such occasion by any appraiser(s) selected by it to appraise the condition and value of the Defendant real property pursuant to 19 U.S.C. § 1606; and

- to be accompanied on any such occasion by any government or contract personnel selected by it for the purpose of conducting an inventory of the Defendant real property; and

- to be accompanied on any such occasion by any federal, state, and local law enforcement officers selected by it to ensure the safety of any person acting under the Writ of Entry;

C.      That notice of this action be given to all persons known or thought to have an interest in or right against the properties;

D.      That defendants (a) through (yy) be forfeited and condemned to the United States of America;

E.      That subsequent to and post-trial, to: decree, confirm, enforce and order an Order of

Forfeiture as to defendants (a) through (yy) to the United States of America; and thus order the

Internal Revenue Service, Criminal Investigations, or its delegate, to dispose of defendants (a)

through (yy) as provided by law; and

     F.     Award Plaintiff, the United States, all other relief to which it is entitled, including the

costs of this action and for such other and further relief as this court deems just and proper.

     Dated this 2nd day of September, 2011.

                            CARLIE CHRISTENSEN
                            United States Attorney

                            Cy H. Castle
                            Assistant United States Attorney

VERIFICATION

I am a Special Agent of the Internal Revenue Service, Criminal Investigative Division of the United States Department of Treasury.  I have been a Special Agent for approximately seven years.  Prior to that, I was a Special Agent with the Internal Revenue Service, Criminal Investigation Division.  During my time as a IRS Special Agent, I have been assigned to work a large variety of white collar crime matters, as well as major financial fraud violations resulting from violations of Title 18 of the United States Code.  As a result of my training and experience, I have conducted numerous cash flow analyses and I am familiar with the federal laws relating to the various types of white collar crime fraud and money laundering matters.  I have been the lead case agent or assisted in numerous white collar and financial fraud investigations which have resulted in seizure, search and arrest warrants.  I have also testified in federal court regarding those matters.

I have read the contents of the foregoing Complaint for Forfeiture In Rem and verify under penalty of perjury pursuant to 28 U.S.C. § 1746 that the statements contained therein are true and correct to the best of my knowledge and belief

Executed on this ___ day of September, 2011.

Wade Berrett
Special Agent, IRS-CID

ATTACHMENT A



ATTACHMENT B



# FLOW CHART B

## CHRIS HARRIS MONEY FLOW

### THROUGH WELVENTURE AND WORLD WIDE TRAINERS BANK ACCOUNTS