```
1              IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

3

4

5    _____

     UNITED STATES OF AMERICA        )
6                                    )
                                     )
7              Plaintiff,            )
                                     )
8         vs.                        ) Case No. 2:11-CV-806 DAK
                                     )
9    APPROXIMATELY UP TO $15,034,663 )
     IN FUNDS CONTAINED IN TEN BANK  )
10   ACCOUNTS, et al.,               )
                                     )
11                                   )
               Defendants.           )
12   _____)

13

14   ************************************************************

15                        S E A L E D

16   ************************************************************

17

18          BEFORE THE HONORABLE DALE A. KIMBALL

19              DATE:  OCTOBER 7, 2011

20          REPORTER'S TRANSCTIPT OF PROCEEDINGS

21              HEARING ON PETITION

22

23

24

25              Reporter:  REBECCA JANKE, CSR, RMR
```

1

```
 1
 2                         A P P E A R A N C E S
 3
 4   FOR THE GOVERNMENT:    U.S. ATTORNEY'S OFFICE
 5                          BY:  CY H. CASTLE, ESQ.
 6                          185 SOUTH STATE, SUITE 400
 7                          SALT LAKE CITY, UTAH 84111
 8
 9                          U.S. DEPARTMENT OF JUSTICE
10                          ASSET FORFEITURE AND MONEY
11                          LAUNDERING SECTION
12                          BY:  JEAN WELD, ESQ.
13                          1400 NEW YORK AVENUE NW
14                          WASHINGTON, D.C. 20530
15
16   FOR THE DEFENDANTS:    PARSONS, BEHLE & LATIMER
17                          BY:  MICHAEL W. YOUNG, ESQ.
18                          201 SOUTH MAIN STREET, SUITE 1800
19                          SALT LAKE CITY, UTAH 84111
20
21                          DEUTSCH WILLIAMS
22                          BY:  STEVEN J. BROOKS, ESQ.
23                          ONE DESIGN CENTER PLACE, SUITE 600
24                          BOSTON, MASSACHUSETTS 02210
25
```

<u>I N D E X</u>

| <u>WITNESSES</u> | <u>EXAMINATION</u> | <u>PAGE</u> |
|---|---|---|
| BARBARA AUTERIO | Direct by Brooks | 18 |
| | Cross by Castle | 61 |
| | Redirect by Brooks | 106 |

<u>E X H I B I T S</u>

| <u>GOVERNMENT'S</u> | <u>RECEIVED</u> |
|---|---|
| 1 | 74 |
| 2 | 94 |
| 3 | 95 |
| 4 | 96 |
| 5 | 97 |

| <u>DEFENDANT'S</u> | <u>RECEIVED</u> |
|---|---|
| A | 78 |
| E | 34 |
| F | 45 |
| G | 51 |
| I | 54 |
| K | 58 |

3

```
 1   OCTOBER 7, 2011                          SALT LAKE CITY, UTAH
 2                       P R O C E E D I N G S
 3                              *  *  *
 4             THE COURT:  We're here this morning in the matter of
 5   the United States of America versus a bunch of assets,
 6   2:11-CV-806.  Mr. Cy Castle and Ms. Jean Weld representing
 7   the United States.  Mr. Michael Young and Mr. Steven Brooks.
 8             MR. BROOKS:  Good morning, Your Honor.
 9             THE COURT:  Good morning.
10             Now, you have a motion for protective order.
11             MR. BROOKS:  The reason for the motion for
12   protective order simply is that there is a sensitivity of
13   Mr. Taylor's client base.  It's not public knowledge for a
14   lot of his clients.  If it's still under seal and it remains
15   under seal, I suspect the information would not get out
16   anyway and, therefore, perhaps a protective order is not
17   necessary.  To the extent the seal is released, then we would
18   ask that a protective order be entered so that the
19   information concerning American International's clients are
20   not disseminated to the public.  It's very sensitive and,
21   quite frankly, if the clients were aware of the proceeding my
22   sense is Mr. Taylor and American International would lose
23   part of its client base.
24             THE COURT:  We are still under seal, right?
25             MR. CASTLE:  Your Honor, we are still under seal.
```

1    There will become a point --

2              THE COURT:  Which reminds me, are there people here

3    who can't be here?

4              MR. CASTLE:  No.  I think everyone, Your Honor, that

5    is present, it's appropriate for them to be here.

6              Your Honor, as Court to knows, the Complaint is

7    still under seal, but there will come a point in a week or

8    two that we will have to unseal the Complaint because of the

9    requirement to serve other people who have interest in the

10   properties that we have either seized or filed a lis pendens

11   against, so there will become a point where the protective

12   order will become an issue, and we submitted objections

13   simply asking American International to simply identify what

14   exhibits they deem need to be protected, but we don't have

15   any objection to the general concept.

16             We were just not real clear which documents they

17   wanted sealed.  So, if they could do that, and perhaps the

18   Court can enter an order today, then it would at least cover

19   that issue so we could move forward to have the Complaint

20   unsealed and appropriately served on the appropriate parties.

21             THE COURT:  How can I enter the order today if it's

22   insufficiently specific?

23             MR. BROOKS:  We're just interested in the identity;

24   if for example, during the course of this hearing, on either

25   direct examination or cross examination, a question is asked

1    about the identity of the some of the clients.

2              THE COURT:  All right.

3              MR. BROOKS:  Because part of this issue is going to

4    deal with the viability of the corporation.  The viability of

5    the corporation is directly related to the amount of clients

6    they have on a continuing basis, the prospective clients they

7    have.  It's that identity that I wish protect, sir.

8              MR. CASTLE:  Does that mean we want to protect the

9    transcript of today's hearing or the clients?

10             THE COURT:  Obviously at least some of it he's

11   asking.

12             MR. CASTLE:  That's perhaps something, Your Honor,

13   we could do at the end of the day, not at the first of the

14   day, meaning today's date.

15             THE COURT:  Maybe it's something -- Mr. Brooks,

16   maybe it's something that the two of you could confer about

17   after today and then pinpoint your disagreements, if any,

18   after that, and then I'll rule on what disagreements are left

19   in terms of what ought to be protected.

20             MR. BROOKS:  That would be fine.

21             MR. CASTLE:  That's a good idea, Your Honor.  And,

22   like I said, all we're asking for is identification so that

23   we know.

24             THE COURT:  All right.  Now you know more than you

25   knew five minutes ago about what they want protected, right?

1          MR. CASTLE:  Well, I wish I could say that, but at

2     least I know about the hearing part.

3          THE COURT:  The clients.

4          MR. CASTLE:  Right.

5          THE COURT:  The clients are what they want

6     protected, the identity of the clients.

7          MR. CASTLE:  Right.

8          THE COURT:  All right.  Now, somebody wants to call

9     a witness, right?

10          MR. BROOKS:  Yes, Your Honor.

11          THE COURT:  Do you need to make an opening statement

12     here today?  How would you like to proceed?

13          MR. BROOKS:  I would like to make just a brief

14     opening, sir.

15          MR. CASTLE:  And we would, too, Your Honor.

16          THE COURT:  All right.  Go ahead, Mr. Brooks.

17          MR. BROOKS:  Your Honor, I believe the brief and

18     the -- that we filed and the reply brief that we filed in

19     response to the government's brief boils down to one

20     particular issue.  We believe -- and I'm not going to discuss

21     the merits of the case because that's for another day.  We

22     obviously don't agree with the government's position that

23     there was criminality on the part of American International

24     Security, nor do we believe that an in rem proceeding should

25     exist in the first place because we believe American

1   International and its prime principal, it's only principal,

2   Mr. Taylor, was innocent of any wrongdoing.

3          THE COURT:  I understand you're not waiving any of

4   those claims.

5          MR. BROOKS:  That's correct.

6          THE COURT:  Today you're quarreling about whether --

7   what's been seized is legitimately seized, right?

8          MR. BROOKS:  That's correct, Your Honor.  And we go

9   on to say that, although the government has not chosen to

10  respond to the argument that venue and jurisdiction is not

11  properly here in Utah.  However, having said that, we would

12  waive that for another day as well because we are going to

13  hotly contest that particular issue, as we believe that it's

14  like an octopus, sir.  The body of the octopus is in

15  Massachusetts.  The tentacle, one small tentacle, is in Utah.

16  They took the whole body and brought it into Utah because one

17  of the alleged co-conspirators has a house in Utah or a bank

18  account in Utah.

19         We don't think that's proper.  We believe it belongs

20  in Massachusetts.  But, again, we will waive that argument

21  for today and bring it up again at an appropriate time.

22         However, we believe it boils down to one fundamental

23  issue.  I don't think there is going to be any argument that

24  American International is a legitimate business.  It has been

25  in existence for almost a quarter of a century, doing very

1   good work.  It's an A+ corporation as far as its credit goes.

2   The community ties are clear.  The principal, Mr. Taylor, has

3   lived in Massachusetts forever, except for the time he served

4   in the United States Army.  And he has a family here.  He has

5   children here.  The business has been here.

6        And I'm, for the moment, not sure anyone could argue

7   that, as far as the hardship -- you took all their money.  It

8   is a service corporation.  A service corporation lives on the

9   amount of money it has.  They took every cent -- not every

10  single penny.  Let's just say 95 percent of the money was

11  taken and seized by the United States Government.  I don't

12  know any other business that could have 95 percent of its

13  assets taken and survive in a good state.

14       So, it leaves us one fundamental issue, and the

15  fundamental issue is, is whether the taking of that money

16  represents the seizure of the business.  Your Honor has seen

17  the briefs.  We disagree with the government's position on

18  the law.  We don't believe any case has ever spoken to this

19  particular issue because most of the money -- most of those

20  corporations whose assets were seized, including money, were

21  sham corporations, running Ponzi schemes or weren't going to

22  use the money that was going to be returned for purposes of

23  the corporation.

24       In the Gilchrist case, for example, they were going

25  to use it to pay attorneys -- not that we're opposed to

1    paying attorneys, sir, but they were were going to use it to

2    pay attorneys to establish a legitimate corporation after the

3    fact.  And the Court had no trouble with that and said, "I'm

4    not going to give you your money back."  And that's the

5    appropriate and we think the correct decision.

6           But that's not the case here.  Here we have a

7    legitimate corporation, a viable corporation, and suddenly

8    they're put into a position of having to scramble for their

9    money.  The government will argue, and I would suspect in

10   their brief they did -- they say, "Borrow it.  Go into debt.

11   We won't give you your money back, but you go into debt.  Use

12   your credit lines."

13          So, should we be -- should my client be in a

14   position to be forced to borrow when they have -- their sole

15   mistake was keeping the money there?  They didn't buy houses.

16   They didn't by boats.  They didn't buy Krugerrands.  They

17   kept the money there, all visible, in one bank account.

18          The government, in their case, will argue that there

19   were multiple bank accounts, over a hundred bank accounts.

20   We only had one.  And it was that one bank account that kept

21   all that money there.  $5.3 million was kept in an account.

22   Maybe not a good business practice, but it was there.  My

23   client wasn't afraid.  He hadn't done anything wrong.  He

24   kept the money there.  He used that to support his business.

25   That's his capital.  That's his growth.

1           During the course of -- you'll hear Ms. Auterio's
2    testimony that the way American International runs its
3    business is, they go out and they prospect for clients.
4    That's Mr. Taylor's function.  He's not a money -- he's not a
5    numbers person.  He goes out and gets the clients.  He's the
6    face of the corporation.  And when they get those clients,
7    they have to support those clients.

8           You will hear testimony from Ms. Auterio today that,
9    in the beginning of this contract, which is the -- which is
10   the nexus of this case, is that in 2007 and 2008, when this
11   contract begins, the so-called fraudulent contract, they were
12   losing money because they had to support the expense ratios
13   necessary to start up, and it wasn't until approximately 2009
14   and 2010 that they made it.

15          We will also bring testimony before this Court to
16   show you the profit margin on that particular contract was in
17   fact about 20 percent.  Normal contract profit for American
18   International was 50 percent.  Now, I'm not sure, again, that
19   is what the Court needs to address, but we're here to address
20   whatever questions the Court has concerning the methodology
21   that was used in American International.

22          But I really believe it comes down to Your Honor
23   determining, as a matter of law, that the taking of almost
24   every penny of the corporation represents a seizure of the
25   business and, as such, the money should be returned to my

1    client.  Thank you, sir.

2            THE COURT:  Thank you, Mr. Brooks.

3            Mr. Castle.

4            MR. CASTLE:  Ms. Weld will be doing this part, Your

5    Honor.

6            THE COURT:  Ms. Weld.

7            MS. WELD:  Thank you, Your Honor.  Good morning,

8    Your Honor, may it please the Court, Jean Weld here to help

9    out Mr. Castle with the forfeiture aspects of this case.  I

10   work at the Forfeiture and Money Laundering Section for the

11   Department of Justice, and I have to give you my deepest

12   apologies, Judge, for my voice this morning.  I have had a

13   little too much air time lately.  I have been feeling a

14   little like George Clooney and up in the air, and I think the

15   change in seasons and the time zones is kind of finally

16   getting to me.  So I'm going to try to hold on to the voice

17   for the duration of the hearing this morning.

18           What I first would like to address -- we have

19   briefed it for the Court, but in rem jurisdiction for

20   forfeiture is a little bit of an obscure area of the law

21   that, if you haven't encountered before, might be a little

22   confusing to the Court.  And the reason that it's very

23   critical here is that any release of the funds that have been

24   seized as a result of your warrant of arrest in rem will be

25   lost to the jurisdiction of this Court, will also be lost to

1    the ability of the government to civilly forfeit in the

2    future.

3              And the reason is that we used 18 USC 984, which is

4    a fungible property statute, which allows us to look at a

5    bank account into which alleged criminal proceeds have been

6    deposited, which is what we have alleged in the Complaint in

7    this case, and go back 12 months, and to the extent that any

8    of those funds are -- were deposited in the last 12 months,

9    that statute allows us to civilly seize for forfeiture an

10   equivalent number.  That's what was done here.

11             As you know, Judge, the initial number was somewhere

12   around $9 million, however that wasn't the balance in the

13   account.  There's no intent to go after any additional funds

14   other than the amount that was seized and the amount that's

15   still retained.

16             The 100 thousand that was released last month, for

17   example, is gone from the civil forfeiture.  The Melon Bank

18   closed their account, so there is no more money coming into

19   the account into which the alleged criminal fraud proceeds

20   were originally deposited, so the amount that we currently

21   have under seizure is the -- all the amount we will be able

22   to civilly forfeit from AISC unless the company gets indicted

23   and we pursue criminal forfeiture, in which case there is a

24   possibility of a criminal forfeiture money judgment down the

25   road, but that would have to be obtained in the criminal

1    case.

2         So the government really is in a position here of --

3    I'm trying not to touch too many things, too many surfaces in

4    the courtroom.  The government is in the position, Your

5    Honor, really, of having to resist any release of funds as

6    requested unless there is a substitute res or a substitute

7    property put up of an equivalent value.  We do not intend to

8    seize American International Security Corp.  We do concede it

9    is a legitimate business.  We do contend that the business

10   itself has not been seized here, and I submit, Your Honor,

11   that the evidence, as elicited during the hearing this

12   morning, will help to define that.

13        Our understanding was that the company was not

14   challenging the actual legitimacy of the seizure, as Your

15   Honor postulated a moment ago.  I don't think that they have

16   challenged that the procedures that were used with this Court

17   and the warrant and the statutes that we used were

18   inappropriate.  I think -- my understanding is that the

19   challenge is that they can no longer function and that their

20   position is that the 983 (f) provision that grants relief to

21   any parties who have had assets seized as a result of some

22   forfeiture would allow this Court to release some money.

23        First, because the business, itself, has been

24   constructively seized and, secondly, because they can

25   establish that the hardship of that seizure outweighs any

1    risk to us, to the government, that the funds would no longer

2    be there.

3         Quick point on that last measure, risk that the

4    funds would no longer be there.  The cases are really

5    consistent that release of currency automatically -- well,

6    generally, in most cases, means that the funds are no longer

7    going to be there.  The only reason to have currency released

8    is to spend it.  So that would be our position, that it would

9    be a hundred percent risk that these funds would no longer be

10   there.

11        We do -- we have briefed that the burden is on AISC.

12   Our point that no Court has yet accepted a constructive

13   seizure argument that we have made in our brief is not to say

14   that that construct wouldn't necessarily be appropriate under

15   the right facts, and we do grant that the facts -- there are

16   only three cases in which that doctrine has been argued.  And

17   in those three the three cases -- the U.S. versus -- well,

18   Southern District of Ohio case of seizure of accounts and the

19   seizure warrants of the Northern District of West Virginia

20   and then the Gilchrist Blaine case that Mr. Brooks referred

21   to.

22        In those cases, we grant the facts were a little

23   different than this case.  I believe Mr. Brooks can

24   distinguish based on the facts; however, we will show that

25   this company has not been shut down, that its doors will not

1    close as a result of the seizure, and, again, even if the

2    Court were to find a constructive seizure here, we would

3    maintain that the company has to put up some equivalent res

4    to justify any release of the currency because the currency

5    will be spent and will not be available at the end of the

6    day.

7         Our position is that this is not the right time for

8    the release of funds because they won't be able to establish

9    hardship under 983 (f)(1)(D) -- or (C), sorry, which gives as

10   an example, Judge, the non-functioning of a business, and you

11   just don't have the non-functioning here.  You have hardship,

12   but it is not sufficiently substantial to outweigh the risk

13   to the government that the money will be spent.  Thank you.

14        THE COURT:  Thank you.

15        Mr. Brooks, you may call your witness.

16        MR. BROOKS:  Yes.  Petitioner calls Ms. Barbara

17   Auterio to the stand.

18        THE COURT:  Come up here and be sworn, please, right

19   up here in front of Court.

20        MR. CASTLE:  Your Honor, if I could make a request

21   to the Court.  My understanding is there is another witness

22   in the courtroom for American International.  I would ask

23   that that witness be excluded during the testimony of

24   Ms. Auterio.

25        THE COURT:  Are you going to call another witness?

1          MS. AUTERIO:  Excuse me?

2          THE COURT:  Mr. Brooks, are you going to call

3     another witness?

4          MR. BROOKS:  We're not sure we are going to call

5     him, the accountant who does the books for American

6     International.  A lot will depend on the examination of

7     Ms. Auterio and the cross examination, and we are -- I have

8     no objection to having him wait outside the courtroom.

9          THE COURT:  All right.

10         MR. CASTLE:  And then, Your Honor, we, in turn,

11    might have another witness, who is Wendy Spalding, so we

12    would identify her.

13         THE COURT:  Both of them can be excluded during this

14    testimony.

15         Right here.

16                    BARBARA AUTERIO,

17    the witness hereinbefore named, being first duly cautioned

18    and sworn or affirmed to tell the truth, the whole truth, and

19    nothing but the truth, was examined and testified as follows:

20         THE CLERK:  Please state your name and spell it

21    for the record.

22         THE WITNESS:  Barbara.  B-a-r-b-a-r-a.  Jean.

23    J-e-a-n.  Auterio.  A-u-t-e-r-i-o.

24         THE COURT:  You may proceed, Mr. Brooks.

25

1                          DIRECT EXAMINATION

2    BY MR. BROOKS

3    Q.    Ms. Auterio.  Where do you presently reside, ma'am?

4    A.    I live in Linfield, Massachusetts.

5    Q.    And how long have you lived in Massachusetts, please?

6    A.    My entire life, 44 years.

7    Q.    And would you please tell the Court your educational

8    background.

9    A.    High school diploma.  I took some computer courses

10   after high school, but that's it.

11   Q.    And where are you currently employed?

12   A.    American International Security.

13   Q.    And when were you first employed there, please, ma'am?

14   A.    1993.

15   Q.    So, for approximately 18 years?

16   A.    Yes.

17   Q.    And what is your job title at American International

18   Security?

19   A.    I don't have a specific title.  I tend to use different

20   ones, depending on what I'm doing.  Treasurer, director,

21   office manager, operations manager, basically whatever

22   fits.

23   Q.    Now, what is the present location of American

24   International Security?

25   A.    28 State Street, Boston, Mass.

1    Q.    And prior to being at 28 Street State, where were you

2    located?

3    A.    60 State.

4    Q.    And how long have you been located in Boston or

5    American International been located?

6    A.    Since 1994.

7    Q.    Now, prior to American International Security, there

8    was a prior corporation, was there not?

9    A.    Yes.

10   Q.    And what was the name of that?

11   A.    North American Security Consultants.

12   Q.    Now, would you please describe for me what American

13   International Security does?

14   A.    We provide security services, guard and patrol,

15   protection detail, and customer service type -- more of a

16   consulting, security consulting.

17   Q.    And is that fundamentally what American has done since

18   the inception in 1994?

19   A.    Pretty much, yes.  We performed investigative work in

20   the early part of our -- and we kind of faded that off.

21   Q.    And who is the principal of American International

22   Security, please?

23   A.    Michael Taylor.

24   Q.    And American International Security is an S

25   Corporation, is it not?

1    A.    It's an S Corp., yes.

2    Q.    And who is the shareholder in that corporation?

3    A.    Michael Taylor.

4    Q.    Are there any other shareholders?

5    A.    No.

6    Q.    And who is the, if you would, the chief executive

7    officer of that corporation?

8    A.    Michael Taylor.

9    Q.    Now, American International -- are you in charge of the

10   accounting?

11   A.    Yes.

12   Q.    And did -- was there a company or any individual who

13   helped you set up the accounting?

14   A.    Goldberg & Associates.

15   Q.    And is there specifically a person at Goldberg &

16   Associates who does the accounting?

17   A.    There is now.  When we started it was Don Goldberg, who

18   owns the company, and he had an assistant, Harriet, who

19   helped me set up the accounts in my system and, after the

20   first year, Mark Schwarz started handling our taxes.

21   Q.    And how long has Mr. Schwarz been effectively the

22   accountant for American International?

23   A.    I can't remember what year he started, probably 2004,

24   2005, somewhere around there.

25   Q.    Now, if you would, as manager of the Boston office,

1   please go over your specific functions on a daily basis.

2   A.    Let's see.  I send out invoices.  I log payments.  I

3   pay -- I do all paying of our employees, our contractors, any

4   and all bills.  I take phone calls, give pricing, almost

5   anything.

6   Q.    Now, what -- with respect to the accounting function,

7   what role, if any, does Mr. Taylor play?

8   A.    None.

9   Q.    Now --

10          MR. CASTLE:  Well, Your Honor, does that mean --

11          THE WITNESS:  No role.

12          MR. CASTLE:  Does that mean he doesn't play any at

13  all?

14          THE COURT:  You're going to get to cross examine.

15  Q.    BY MR. BROOKS:  Now, would you please explain for the

16  Court the types of security projects that American

17  International does and where they are located.

18  A.    We currently have work at the -- at Logan Airport.

19  It's on the outskirts of the airport.  We do security

20  screening for private charters.  We also have work that we do

21  steadily in New York at a news media building, protecting the

22  shows.  We also do a lot of protection detail for the news

23  media when they fly to foreign countries and they need

24  protection.

25  Q.    And what about -- do you do any work at Disney World?

| | |
|---|---|
| 1 | A.    It's the parent company.  It's owned by Disney. |
| 2 | Q.    Right.  But your work is in New York? |
| 3 | A.    Correct.  And sometimes in foreign countries. |
| 4 | Q.    Now the -- when you say "foreign countries," could you |
| 5 | give the Court an understanding where these foreign countries |
| 6 | are located? |
| 7 | A.    Libya, Haiti, Iraq, wherever news is and the media |
| 8 | wants to travel, where action is.  Cairo. |
| 9 | Q.    Now, what type of accounting system do you presently |
| 10 | have? |
| 11 | A.    Accounting? |
| 12 | Q.    Yes. |
| 13 | A.    We use QuickBooks. |
| 14 | Q.    And who's in charge of the QuickBooks? |
| 15 | A.    I am. |
| 16 | Q.    And the payment to the -- well, let me step back for a |
| 17 | moment.  In these international contracts -- |
| 18 | A.    Uh-huh. |
| 19 | Q.    -- is it necessary to pay people overseas? |
| 20 | A.    Yes. |
| 21 | Q.    And how do you normally pay people overseas? |
| 22 | A.    Mostly wire transfers. |
| 23 | Q.    And did you have a primary bank? |
| 24 | A.    Melon Trust. |
| 25 | Q.    And is it still your bank? |

1    A.    No.

2    Q.    And why not?

3    A.    After the funds were seized, the bank sent us a letter

4    wishing us no longer to be a client.

5    Q.    And did they, as part of that, do anything relative, to

6    your knowledge, to Mr. Taylor?

7    A.    Yes.  They also sent him a letter asking him to remove

8    his funds from the bank because he was no longer welcome

9    there.

10   Q.    Now, would you please explain to the Court how, if at

11   all, that has affected the business of International --

12   American International?

13   A.    It basically cut us off because that was our main --

14   that was our basic lifeline to our work, our funds.  All of

15   our money was there.  I'm not able to even make payments.  I

16   have three outstanding bills that I have to pay, which, at

17   the moment, I'm not set up to do wire transfers out of

18   another bank, so all of my banking is basically pretty much

19   stopped.  And it just basically tied our hands.

20   Q.    Now, are you familiar with the term "credit rating"?

21   A.    Yes.

22   Q.    And what is presently the credit rating, to your

23   knowledge, of American International?

24   A.    I believe we are an A+ credit rating.

25            THE COURT: What is it?  Excuse me?

1           THE WITNESS:  A+.

2   Q.    BY MR. BROOKS:  And that was before Melon disassociated

3   themselves with you?

4   A.    Correct.

5   Q.    Now, how many employees does American International

6   have?

7   A.    Approximately 23.

8   Q.    And where are they located?

9   A.    We have employees in Massachusetts, and we have

10  employees in New York.

11  Q.    Now, how many of those are full-time and how many of

12  those are part-time?

13  A.    There are five full-time, including myself and

14  Mr. Taylor, and the rest are part-time.

15  Q.    Now, what are some of the duties of the part-time

16  employees?

17  A.    There's part-time employees that is -- let's see.

18  There's a supervisor at each site, in Boston and in New York.

19  And they have several -- many part-time employees under them.

20  The supervisor fills the shifts with the part-time employees.

21  They -- some do security screening, some just do

22  protection.

23  Q.    And that would be at, say, at the airport?

24  A.    At the airport or at the building in New York.

25  Q.    Now, what are -- do the full-time -- you say there are

1   full-time employees.  Would you describe the function,
2   besides your own.
3   A.    Lisa Carol, who is my assistant, she logs bills in.
4   She gets the mail.  She opens it.  She logs invoices in.  She
5   has administrative privileges, and she orders office
6   supplies.  She takes care of flight arrangements, that type
7   of stuff.  And we have another employee, Mick Mathis, who is
8   a supervisor at the airport.  And he handles scheduling as
9   well as talking to new possible clients, charter companies at
10  the airport.
11  Q.    When you say "charter clients," what do you mean?
12  A.    The work we do there, it's -- we do screening for
13  private charters, and there's a lot -- we have 24/7 security
14  at the facility, but quite often -- we've picked up a lot
15  more work over -- just recently for private charters,
16  screening football, baseball, basketball teams flying into
17  the airport and screening them either at the venue or at the
18  airport itself.
19  Q.    So like the Boston Bruins and the Boston Celtics?
20  A.    Actually we normally screen the teams that are coming
21  in to play against them, the Canadians or ...
22  Q.    Now, do you know what the approximate annual payroll of
23  American International is right now?
24  A.    For everyone together?
25  Q.    Yes.

```
 1    A.     Including Michael Taylor?

 2    Q.     However you want to answer the question.

 3    A.     I believe it's about 600 thousand not including Michael

 4    Taylor.  Michael Taylor, he doesn't actually take a paycheck.

 5    We just pay withholding for him.

 6    Q.     Would you describe, please, what you mean you pay

 7    withholding for him.

 8    A.     We just pay tax for him.  He gets a zero dollar amount.

 9    It's federal tax, FICA, state tax.

10    Q.     And has the company elected treatment under Subchapter

11    S?

12    A.     Yes.

13    Q.     Now, does the amount of clients that American

14    International have vary over the years?

15    A.     Yes.

16    Q.     And would it be fair to say that you have new clients

17    coming and new clients who leave?

18    A.     Absolutely.  Yes.

19    Q.     And that has been consistent since 1994?

20    A.     Yes.

21    Q.     And who -- in order to get new clients, what processes

22    does American International follow?

23    A.     Normally Michael Taylor basically goes and meets with

24    people.  Sometimes people just call in, they are looking for

25    something.  We will take the job.  Sometimes Mr. Taylor flies
```

1    out and meets with people and discusses their needs and what

2    we can do and...

3    Q.    Has this been a consistent model since 1994?

4    A.    Yes.

5    Q.    Now, would you -- without mentioning necessarily their

6    names, would you describe some of the companies that you do

7    security work for, besides the news corporations.

8    A.    We have done a lot of work for major oil companies,

9    other types of media, as opposed to our regular full-time

10   client, more like the newspaper type.  Another security

11   company, as well, also hired us.  A lot of private, just

12   private companies that have employees that need to travel and

13   need protection.

14   Q.    Did you ever do security work for an airline?

15   A.    Yes.

16   Q.    And a major airline?

17   A.    A major airline.

18   Q.    And did you ever do security work for when there was a

19   labor strike?

20   A.    Many times.

21   Q.    And were they large corporations that you represented?

22   A.    Usually, yes.

23   Q.    Now, have you had some of your clients for a long

24   period of time?

25   A.    Yes.

1   Q.     And could you describe for what period, normally?

2   A.     September 11, 2001, we started working at the airport

3   and have been there every day since.

4   Q.     2011?

5   A.     I'm sorry, 2001.  And the building in New York, we have

6   been there -- I don't know what year -- probably at least

7   eight years.

8   Q.     Now, are you familiar with the background of Michael

9   Taylor?

10  A.     Somewhat.

11  Q.     Do you know if Michael Taylor had been in the United

12  States Army?

13  A.     Yes.

14  Q.     And do you know in what service?

15  A.     Special Forces.

16  Q.     Now, in these contracts that are overseas, Ms. Auterio,

17  what type of expenses are normally attributable to these

18  types of security?

19  A.     First off, we have to fly people there, so we have a

20  lot of air fare, usually hotel, until we can find them

21  residential housing.  If it's a long-term, we'll need

22  housing.  If it's short-term, it's usually hotel.  Meals.

23  Sometimes computers.  Office supplies.  Almost anything.

24  Q.     How about vehicles or armory?

25  A.     Vehicles.  When we travel to, say, Iraq or Lebanon or

1   Indonesia, we use armored vehicles.

2   Q.    Now, in paying for these projects --

3   A.    Uh-huh.

4   Q.    -- customers, who pays the expenses of the hotel, the

5   air fare, vehicles and assorted other expenses in the

6   beginning of the project?

7   A.    I normally pay for everything -- we don't usually

8   invoice for up to 30 days.  So, after the first month, I

9   usually send my first invoice.  So, after the first month I

10  have already incurred all of those expenses up to that point,

11  and then it's usually anywhere between another 30 to 60 days

12  before I get payment, so I'm usually anywhere between two and

13  three months of expenses and payroll, because I have to pay

14  my guys, before I receive any payment.

15  Q.    And is that pretty well standard in most of your

16  contracts?

17  A.    Pretty much most.  I mean, it takes time for them to

18  get set up because I don't even bill for 30 days.  It's

19  standard.

20  Q.    Now, are those reimbursed expenses?

21  A.    I reimburse -- I am reimbursed for air fare, hotel, but

22  there's a lot of smaller, like Visas and meals -- a lot of

23  things that I cannot -- like I say, insurance costs or

24  anything like that, that I'm not reimbursed for, but I am

25  reimbursed for -- so if I use PSD vehicles or --

1    Q.    What do you mean by PSD?

2    A.    Additional security, protection security detail with an

3    armored vehicle over there.  So, that I'm reimbursed for, as

4    well as my -- the payroll for my guys, but there's still some

5    expenses that, until we build up, we take a loss on.

6    Q.    Now, you say PSD.  Is that -- are those services or

7    expenses?

8    A.    Technically, it's a -- I pay a vendor, so I usually

9    charge an up-charge on that, so I do make profit on it.  So

10   it's kind of a service, and I pay another company for that.

11   Q.    Now -- so you pay the personnel that supports the

12   overseas projects, correct?

13   A.    Correct.

14   Q.    Now, is American International -- and putting aside the

15   contract that brings us here today in Afghanistan for the

16   Department of Defense, the army, is normally American

17   International a contractor, prime contractor or a

18   subcontractor?

19   A.    I mean, at the airport, we are the contractor.  We have

20   been subcontractors before and prime as well, so it basically

21   varies.

22   Q.    And is that overseas as well?

23   A.    Correct.  Yes.

24   Q.    So you have been both?

25   A.    Yes.

1    Q.    Now, would you explain the difference between prime

2    contractor and subcontractor?

3    A.    If we were the prime contractor, we would be dealing

4    directly with the client.  If we were the subcontract, we

5    would be going through another company.

6    Q.    Now, when a contract ends, does American International

7    seek to replace that business?

8    A.    Yes.

9    Q.    And how is that done?

10   A.    Usually Michael Taylor basically goes scouting for new

11   business, looking for opportunities and fielding calls and

12   that sort of...

13   Q.    Now, these payrolls, these expenses, are they paid on

14   a certain time or does it vary?

15   A.    It kind of varies.  For the most part, my guys I pay

16   every two weeks, so if I send a couple of guys over for a

17   year contract somewhere, I pay them every two weeks.

18   Steadily, every two weeks, they get a transfer.  If it's a

19   vendor, usually they will bill me anywhere between twice a

20   month or once a month and then I will pay them that.

21   Q.    Now, if, for some reason, you were unable to pay that

22   personnel overseas, what would happen?

23   A.    They would quit.  They would leave.

24   Q.    Now, does American International, to your knowledge,

25   own any real estate?

1    A.    No.

2    Q.    What assets does American International own?

3    A.    We really don't have -- other than the furniture in our

4    office, that's pretty much it.  A few pictures on the wall.

5    Q.    You rent your space, correct?

6    A.    We rent our space, yes.

7    Q.    Does American International have any brokerage or

8    investment accounts?

9    A.    No.

10   Q.    Does American International supply a 401-K?

11   A.    No.

12   Q.    Does American International have any inventory?

13   A.    We have body armor, helmets, cameras.

14   Q.    And approximate value?

15   A.    I mean, our body armor is pretty much only good for

16   a certain amount of years, and we use it for about four -- I

17   think it has a shelf life of about five years until the

18   plates are no longer useful.  And it's pennies on the dollar

19   what we spend.  Cameras get obsolete.

20   Q.    How many bank accounts does American International have

21   besides the former Melon account?

22   A.    We have two accounts at Bank of America and one at

23   Citizens, I believe.  Yes.  We have an account at Citizens

24   still.

25   Q.    Now, do you know how much money was seized in the Melon

1   account?

2   A.    5,300,000 and change.

3   Q.    And when Melon ended their relationship with American

4   International, was any money returned to American

5   International?

6   A.    We had -- we received a check for approximately 30

7   thousand, which I deposited in Bank of America and later used

8   to pay some payroll and bills.

9          MR. BROOKS:  Now, I don't know how Your Honor wishes

10  to do this.  We have marked, as part of our petition, Exhibit

11  E.  It's in the pleadings, and I would mark it as Exhibit 1

12  for purposes of this hearing if Your Honor wishes to mark it

13  that way.  And I have given a copy to the government.

14         MR. CASTLE:  Well, Your Honor, could we do this just

15  a little differently?

16         THE COURT: Pardon me?

17         MR. CASTLE:  Could we do this just a little

18  differently?  I would like it marked as Exhibit E.  They

19  submitted a number of exhibits through their memorandum in

20  support of their petition, A through K.  I think it will just

21  be easier, one for the record, one for the witnesses, if they

22  just follow what they have already have.

23         THE COURT:  So this is?

24         MR. BROOKS:  Exhibit E.  May I approach the witness,

25  Your Honor?

1           THE COURT:  Yes.  So this is E.

2    Q.    BY MR. BROOKS:  Now, I show you Exhibit E.  Is this a

3    list of bank accounts that American International has

4    presently?

5    A.    Yes.

6    Q.    And is the -- is this, at the time, an accurate

7    statement of the amounts contained in those bank accounts?

8    A.    Yes.  It was accurate as of a few days ago, when I

9    prepared it.

10   Q.    So, is it less now?

11   A.    The Citizens and Bank -- the first Bank of America

12   are -- they are pretty much all pretty close to the same.  I

13   believe I may have received one payment on the Bank of

14   America for approximately 8 thousand.

15   Q.    Now, why --

16           THE COURT:  Are you going to offer it?

17           MR. BROOKS:  I'm sorry.  I would offer that as

18   evidence, Your Honor.

19           THE COURT:  Any objection?

20           MR. CASTLE:  No objection, Your Honor.

21           THE COURT:  E is received into evidence.

22         (Defendant's Exhibit E received in evidence.)

23           MR. BROOKS:  If it please -- strike that.

24   Q.    BY MR. BROOKS:  Why, Ms. Auterio, did you choose Melon

25   as a bank, if you know?

1    A.    Melon, it's a very private -- it's a private bank.

2    It's personal service.  I could call the bank at any time,

3    and they would know who I was without even having to say my

4    name.  It was just the personal service that I received from

5    them, where at Bank of America, there's always long lines.

6    You're just basically one in an million there, and there's no

7    personal service.

8    Q.    Now, do you have that same relationship at any of the

9    banks that are listed on Exhibit E?

10   A.    Other than Melon?  No.  I mean, there are people there

11   I could call, but, for the most part, no.  I mean, I call the

12   bank or I go in, and I'm just the same as anyone else.  Wait

13   in line.

14   Q.    Now, who prepares the American International tax

15   returns?

16   A.    Goldberg & Associates.

17   Q.    Is that who Mr. Schwartz works for?

18   A.    Mark Schwartz, he works for them.

19   Q.    Do you meet him in connection with preparation of those

20   tax returns?

21   A.    Yes.

22   Q.    And what do you give him?

23   A.    He normally comes in.  He'll sit, and it he'll go over

24   the QuickBooks file.  He usually takes a copy.  Sometimes

25   he'll check over things.  He'll ask questions on different

1    things.  Sometimes he'll recategorize stuff, but basically

2    it's the QuickBooks file.  And sometimes he'll ask for copies

3    of certain things that are in there and...

4    Q.    Now, is Mr. Taylor involved in that process?

5    A.    No.

6    Q.    How about Lisa Carol?

7    A.    Occasionally, because she has all of the bills in her

8    office, like the credit card bills, so he'll ask for credit

9    card statements, so she'll usually just -- basically

10   administrative support, help get the copies he needs or the

11   files he needs.

12   Q.    Now, you stated in answer to a prior question

13   approximately $5.3 million was seized.  Were taxes paid on

14   that amount?

15   A.    Yes.

16   Q.    And let me ask you a question.  Who oversees whether

17   all the taxes are paid on all the income?

18   A.    After Mark completes our taxes, he sends a copy to me.

19   Any payments that need to be made, I write out the checks and

20   mail them in with whatever stubs I need to.

21   Q.    Have you ever been instructed not to invoice where

22   services were rendered?

23         MR. CASTLE:  Objection, Your Honor.  I'm not sure of

24   the relevancy --

25         THE WITNESS:  No.

1          MR. CASTLE:  -- in this hearing related to the issue

2     of hardship.  How is that relevant?

3          MR. BROOKS:  I'll withdraw the question.

4     Q.   BY MR. BROOKS:  Now, did Melon Bank provide you an

5     electronic record of the seizure?

6     A.   Yes.

7     Q.   Have you replaced the functions of Melon Bank presently

8     with your new banker?

9     A.   No.  I have applied to be able to do wire transfers,

10    but I'm waiting for that process to be complete.

11    Q.   Now, you have a line of credit, do you not?

12    A.   We do.

13    Q.   And with whom is that?

14    A.   Currently we have a line of credit with Bank of

15    America.

16    Q.   Now, do you pay Mr. Taylor's taxes?

17    A.   If there is a payment that needs to be paid, yes.  I

18    would print that and write that as well.

19    Q.   Has there been, to your knowledge, a time when

20    Mr.  Taylor has gotten a refund?

21    A.   Yes.

22    Q.   What did he do with the refund, to your knowledge?

23    A.   He deposits it in the American International account.

24    Q.   Now, over a period, say a period of, say, 2008 to --

25    through 2010, what types of balances do you keep in the Melon

1    check -- in the former Melon checking account?

2    A.    From 2008 on, basically all our funds that come in go

3    directly to Melon.  It varied from anywhere between 2 and 5

4    million, I would guess.

5    Q.    Now, you pay some of Mr. Taylor's personal expenses; is

6    that correct?

7    A.    Yes.

8    Q.    And would you explain to the Court what those types of

9    expenses are?

10   A.    We pay his son's college.  We're an S Corp., so we pay

11   his bills.  He doesn't actually take a paycheck.  Sometimes

12   credit card bills, a lot of times when he travels, things

13   like that.

14   Q.    Now, are you aware of expenditures by Mr. Taylor to

15   schools?

16   A.    Yes.

17   Q.    And would you explain what those were?

18   A.    He donates a lot to the schools.  He basically has paid

19   for football fields, just different expenses.  Anything the

20   schools need, he usually will pay for.

21   Q.    Now, are you personally aware of some of the assets

22   that Mr. Taylor has?

23   A.    Like his home?

24   Q.    Yes.

25   A.    Yes.

1    Q.    And where is that located?

2    A.    He lives in Harvard, Mass.

3    Q.    And does he have a vacation home?

4    A.    Yes.

5    Q.    And where is that located?

6    A.    In Vermont.

7    Q.    Other than those homes, do you know of any other assets

8    that Mr. Taylor has?

9    A.    I don't believe so.  A vehicle.  I mean, cars.

10   Q.    Other than cars?

11   A.    I don't believe he has any other.

12   Q.    Are you familiar with Mr. Taylor's personal bank

13   account?

14   A.    Yes -- well, I used to be.

15   Q.    And how much money do you know that Mr. Taylor had in

16   that personal bank account?

17   A.    I would normally check his balance at Melon, and he

18   would normally keep anywhere between 4 and 8 thousand, 4 and,

19   like, $12 thousand.  If I noticed that it was getting low, I

20   would normally make a deposit to keep a balance in that.

21   Q.    Do you know of any savings accounts Mr. Taylor has?

22   A.    No.

23   Q.    Any brokerage accounts?

24   A.    Not that I know of.

25   Q.    Now, subsequent to the seizure of the $5.3 million,

1   what impact did that have on American International?

2   A.     Basically cut our lifeline.  Melon was where I -- where

3   I basically did everything from, and I no longer have that

4   resource.

5   Q.     What about the loss of the money?

6   A.     What do you mean, what about it?

7   Q.     In other words, what impact did that have?

8   A.     It basically put us at a standstill.  I can't start

9   anything new because I don't have the money to front it.  It

10  just basically put us at a standstill.

11  Q.     That was your capital account, was it not?

12  A.     Correct.

13  Q.     Do you have any other -- other than the bank accounts

14  shown on Exhibit E, do you have any other funds?

15  A.     No.

16  Q.     Now, would you explain the importance of not having

17  funds available to the Court, please.

18  A.     If I don't have the funds available for us to start a

19  new project and get it up and running, I won't be able to

20  support that.  Normally, there's a lot of expenses, just to

21  get people places, to -- the air fare to pay.  I have to pay

22  them.  If I don't get paid for 60 to 90 days, several months'

23  worth of payroll and expenses.

24  Q.     Now, in connection with this hearing, did you prepare a

25  monthly budget for American International?

```
 1   A.    Yes.
 2   Q.    All right.  I would show the witness what has been in
 3   our petition marked Exhibit F.
 4           THE COURT:  F?
 5           MR. BROOKS:  F.
 6   Q.    BY MR. BROOKS:  Would you identify that document
 7   please, Ms. Auterio?
 8   A.    It's a monthly budget.
 9   Q.    And what does that represent?
10   A.    Basically this is pretty much what we pay on a monthly
11   basis.  Some of them are actual expenses, like our rent.
12   Some of them are kind of like a combined, what we pay for a
13   year divided by the 12 months, because sometimes they vary.
14   Q.    And I would direct your attention to the payroll.  You
15   see the category Payroll?  I think it's the --
16   A.    Yes.
17   Q.    -- fifth category in.  And that has number of $83,333.
18   Would you please tell the Court what that represents.
19   A.    That's payroll for our Boston and New York jobs as well
20   as withholding for Michael Taylor.
21   Q.    But not income for Michael Taylor?
22   A.    No.
23   Q.    Now, you'll see down towards the bottom of that page
24   something called S Corp. Distributions?
25   A.    Correct.
```

1    Q.    And what does that represent?

2    A.    That represents an approximate amount of the bills I

3    pay for Michael Taylor in a month.

4    Q.    And these numbers, because I noticed they are sort of

5    round numbers, these are not exact numbers, are they?

6    A.    No, not exact.  I mean, the rent is exact.  The parking

7    is exact.  The health insurance is exact, but the others, I

8    kind of had to give an approximate because sometimes they do

9    vary, like telephone is never going to be the same every

10   month.  So I added up what it had cost and divided it by

11   12.

12   Q.    And that would be the same for air fare and

13   transportation costs?

14   A.    Yes.  Air fare is also an approximate because,

15   depending on how many guys I have to fly in any given month,

16   it could go up, it could go down.

17   Q.    And that total figure of 206,617 is your best estimate

18   of a budget for today?

19   A.    Yes.

20   Q.    Would that number change if you got any project?

21   A.    Yes.

22   Q.    And in what way?

23   A.    It would -- I would have increased expenses because I

24   would have to, say, pay to field an operation, to fly guys

25   out there, to pay vendors, PSD, housing.

1   Q.    Now, if there are new -- right now, to your personal

2   knowledge, are there prospective clients out there?

3   A.    Yes.

4   Q.    And would you describe those prospective clients

5   for the Court.

6   A.    We have one that is supposed to start in mid-October,

7   within the next couple of weeks.  It's a major oil company

8   that is planning to go to Iraq to drill for oil, and they

9   want us to provide their security.

10  Q.    And are there other prospective clients?

11  A.    Yes.

12  Q.    And could you describe those.

13  A.    We have another company who has two possible

14  operations.  One would be in Congo and one in Nigeria, all of

15  similar nature.  We basically would be going over with the

16  company, setting up, setting up their security and...

17  Q.    So that the expenses listed in Exhibit F would go up

18  dramatically, would they not?

19  A.    Correct.

20        MR. CASTLE:  Objection, Your Honor.  I mean, that

21  calls for a conclusion.  Let her testify what the effect

22  would be, versus Mr. Brooks.  It's a leading question, too,

23  so I object.

24        THE COURT:  Try not to lead her too much.

25        MR. BROOKS:  All right.  I'll rephrase the question.

1    Q.    BY MR. BROOKS:  How would the new contracts affect the

2    expenses in Exhibit F?

3    A.    They would increase because we would have more

4    expenses.

5    Q.    Would it be a large increase, a small increase?

6    A.    It would be a large increase.  Besides air fare, hotel,

7    vendors, I would have payroll.  Normally, in a foreign

8    country, I would have to have insurance.  I would have

9    insurance costs.  I would have to -- depending on where they

10   were, sometimes they need to get SOS, which is basically safe

11   flight for my guys out of there in case something -- an

12   emergency would happen, as well as health insurance if they

13   are going to be there for anywhere like a year.

14   Q.    Now, also in Exhibit F, you have subcontractor

15   expenses, do you not?

16   A.    I do.

17   Q.    And how would that be impacted by new contracts?

18   A.    If -- the subcontractor expenses that I have listed

19   here, this is for more of the normal monthly that we have, so

20   if I were to get the job and when that starts in Iraq, that

21   would increase because I would have more guys that I would be

22   paying.

23        These here expenses are what I normally spend in a

24   month for the news media and to pay my guys.  So, when the

25   news media travels, this is what that air fare is, and when

1    the -- the payroll for the contractors is what I would pay

2    for them.  So, if I had additional contractors to my regular

3    monthly, obviously that would go up.

4    Q.    And a lot of those costs are what we would refer to as

5    front-loaded, are they not?

6    A.    Yes.

7    Q.    Do you presently have the capacity, with your banking,

8    to entertain new contracts?

9    A.    If I were to take out a loan.

10   Q.    No.  I'm just saying what you have in the bank.

11   A.    We have no funds.  No.  I would probably max out my

12   credit card, and I wouldn't be able to pay my guys with what

13   we have in the bank, no, and we wouldn't be paid for probably

14   90 days at best.

15         MR. BROOKS:  I would offer Exhibit F into

16   evidence.

17         MR. CASTLE:  No objection.

18         THE COURT:  F is received.

19         (Defendant's Exhibit F received in evidence.)

20         MR. BROOKS:  If it please the Court, I would show

21   the witness Exhibit G.

22         THE COURT:  Sure.

23         MR. BROOKS:  Attached to our petition.  I apologize

24   for the small print, Your Honor.

25         THE COURT:  All right.  20/20 with glasses.

1    Q.    BY MR. BROOKS:  Would you identify Exhibit G please,

2    ma'am?

3    A.    Exhibit G is basically a list of our current clients

4    and some prospective clients; one that is supposed to start

5    within the next couple of weeks, and another that's supposed

6    to start within several months later.

7    Q.    And who prepared this document?

8    A.    I did.

9    Q.    And who provided the financial data for this document?

10   A.    I did.

11   Q.    And there are acronyms, letters, albeit very small.

12   Those represent both current clients and prospective clients?

13   A.    Correct.

14   Q.    Now, I believe Exhibit G shows revenues from current

15   clients beginning on 9/11 and for the four months beginning

16   into 9 -- of September of 2012; is that correct?

17   A.    Yes.

18         THE COURT:  Say that again.

19   Q.    I'm sorry.  There are revenues that start on 9/1 of

20   '11, and they go to 9/1 of '12.  Would you explain what those

21   are and how you broke them down?

22   A.    So, the revenues for 9/1, through basically a year of

23   what we would receive in that year from those clients.  And

24   the revenues from the next column, from September to

25   December, is an approximate of how much we would receive in

1   that time period.

2   Q.    Now, when you say "prospective clients," that means

3   there are no -- are there any contracts for those clients

4   presently?

5   A.    Not yet.

6   Q.    How certain, if you would, if you know?

7            MR. CASTLE:  Objection, Your Honor.  That's going to

8   call for speculation.

9            MR. BROOKS:  I haven't finished the question.

10           THE COURT:  What is the question?

11           MR. CASTLE:  Objection to her speculating as to

12   whether they are going to come to pass.  The point is that

13   they are not in place right now.

14           THE COURT:  Well, it's clear that they are not in

15   place right now.  We are entitled to a best judgment about

16   what she thinks might happen.  Go ahead.

17           MR. BROOKS:  Thank you, Your Honor.

18   Q.    BY MR. BROOKS:  When you say "prospective clients,"

19   what do you mean by that, ma'am?

20   A.    People that we are currently talking to regarding their

21   services.  The first prospective client, DE, they were just

22   awaiting their license, and I do know for a fact that they

23   have just received their license, and we are hoping, within

24   the next couple of weeks, to go to Iraq with them.

25   Q.    Based on past experience, when you have prospective

1    clients, how often do they become real clients?

2    A.    Quite often.

3    Q.    If the list of prospective clients of which have start

4    dates of October -- October 11 through -- into March of 2012,

5    would you be able to support, with your present cash flow,

6    the startup costs of those clients?

7              MR. CASTLE:  Objection.  Leading.

8              THE COURT:  Overruled.

9              THE WITNESS:  No.

10   Q.    BY MR. BROOKS:  Would you have been able to pay those

11   startup costs had the money not been seized from the Melon

12   Bank?

13   A.    Absolutely.  Yes.

14   Q.    Would you have used that bank account?

15   A.    Yes.

16   Q.    Has that been your past practice?

17   A.    That's basically the whole way we provide -- that's the

18   way we do business.  We use the money that we have to gain

19   new clients because there's always a startup cost, and,

20   without it, it's difficult to start.

21   Q.    Now, would you please go over, if you would, the

22   current clients and the columns under revenues for the

23   current clients that exist.

24   A.    Well, we have a number of clients.  Some are obviously

25   better than others.  The news.  That's basically we provide

1   security services when they fly to foreign countries to do

2   reports.  That's an approximate.  It's no guarantee monthly

3   on that particular one.  If something bad happens, they are

4   going to fly to Libya.  If nothing happens in any given

5   month, we may not fly anywhere with them.  So it's more of an

6   estimated, what I've done from the beginning of the year

7   until now, divided by the months.

8   Q.   And do they call on a regular basis for services?

9   A.   Yes.  Whenever there's tragedy and they need to report

10  on it.

11  Q.   And you need to be geared up to support that, do you

12  not?

13  A.   We pretty much need to be ready to have guys fly out

14  the next day.

15  Q.   And how do you economically support that?

16  A.   Credit card.  Normally the air fare is put on the

17  credit card and then we use our account to pay for it.

18  Q.   So you would have used the Melon account, would you

19  not?

20  A.   Yes.  Some of the other customers are smaller

21  customers.  That is an approximate of -- some of them are

22  charter companies that we have just recently gained contracts

23  with, and we will be providing services for them, for their

24  teams when they fly in.  The MPI Is a customer that we had a

25  contract and a job -- we still have an open contract with

1    them, however, currently, there are no job orders.  They work

2    off job orders, and we don't have a job order for any

3    services for them for the rest of the year.  So I ended them.

4            The -- it says SFS, 37 thousand.  That is our

5    current airport job.  That's our monthly billing, regular

6    monthly billing, and the WABC at the bottom, 29,946, that's

7    our normal monthly billing as well.

8    Q.    Now, in -- from 1994 to 2011, the revenues of American

9    International, have they varied year-to-year?

10   A.    Absolutely.  Yes.

11   Q.    And so it would be difficult to forecast with any

12   accuracy exactly what's coming in any particular year.  Would

13   that be a fair statement?

14   A.    Yes.

15   Q.    And do you know -- for example, going before 2007, do

16   you know the approximate gross revenues in 2004, 2005 and

17   2006?

18   A.    Probably between 2 and 7 million, different years.

19   Q.    And do you know if you had gross revenues of $11

20   million in 2005?

21           MR. CASTLE:  Objection.

22           THE COURT:  Sustained.

23   Q.    BY MR. BROOKS:  I'll come to that question.  I'll

24   withdraw it.  Now, these projects that you have, are these

25   the employees -- are these W-2 employees or 1099 employees?

1    A.    The top one, the news media, we use 1099's to pay for

2    those.  And the others are all pretty much on our payroll.

3    Q.    Now, the prospective clients, if you have international

4    projects, are those 1099 employees or W-2 employees?

5    A.    It could be either.  Normally the guys prefer to be

6    1099, and them I would normally pay by wire transfer.

7    Q.    And how do you pay the domestic people who are

8    1099's?

9    A.    I would write them a check.

10   Q.    And that check would have been drawn off the Melon

11   account?

12   A.    It would have.

13        MR. BROOKS:  Your Honor, I would be addressing

14   Exhibit I.

15        THE COURT:  Are you going to offer G?

16        MR. BROOKS:  I'm sorry.  I will offer G, Your Honor.

17        MR. CASTLE:  No objection, Your Honor.

18        THE COURT:  G is received.

19        (Defendant's Exhibit G received in evidence.)

20   Q.    BY MR. BROOKS:  This is I.  Now, Ms. Auterio, I show

21   you Exhibit I and I ask you, can you identify this document?

22   A.    This is basically for any new startup.  The previous

23   client -- I mean, the prospective client DE that is supposed

24   to start up mid-October, this would basically be what I

25   would be paying for to start up this job.

1    Q.    And would you explain why the columns show -- it says

2    monthly and it shows annually, yet the numbers are all in the

3    middle.

4    A.    Well, the way it just kind of shifted a little.  The

5    monthly, which is a little further to the right, is an

6    approximate cost of what it would cost me, say, for lodging,

7    in-country transportation, which is PSD and armored vehicles.

8    Air fare is normally -- the guys, the way they work, it's 90

9    days on, two weeks off.  So they would have air fare four

10   times a year.  So, if I had four guys, they would vary at the

11   time they left, so all four guys wouldn't leave at the same

12   time, obviously, but every month or so after the first few,

13   somebody would be flying home for a vacation.

14   Q.    Now, what is the purpose of this document?

15   A.    Basically just to get an idea of what it would cost to

16   start up any new project or any of these new projects.

17   Q.    So, the $159 thousand, which is on Exhibit I, does that

18   represent the total of the startup costs approximately?

19   A.    No, because on this, there is not -- the guys would be

20   paid as well.  They would need to be paid every two weeks, so

21   their salary is actually not on here.

22   Q.    So the number of 159 is too low?

23   A.    It's actually -- would be higher because their salary

24   is not on here.  I just realized that.

25   Q.    And how much -- of course you wouldn't know.  It

1   depends on the project?

2   A.    It depends on the project.  If I were paying the guy

3   150 thousand a year, he would probably -- let's see, because

4   I did it with someone on this sheet.  If I was paying him

5   150, it would be monthly.  I'm not really good at adding up

6   under stress, so I would be paying probably 16 thousand or so

7   in salary.

8   Q.    16 thousand?

9   A.    I really would have to figure out -- 150 divided by

10  26.

11  Q.    So, the 159 thousand represents a lower figure than

12  actual expenses that you have total?

13  A.    Correct.

14  Q.    And this money was normally money that came out of the

15  Melon Bank?

16  A.    Yes.

17  Q.    Now, are there clients, prospective clients, where the

18  number would be higher than the numbers shown on Exhibit I?

19  A.    Basically all of them would because I just realized

20  that I left off the salary for the guys, and depending on

21  what we need, anything could change.  If we need more or less

22  cars, if we need more men, it would definitely increase.

23  Q.    Well, directing your attention to the -- to the

24  contract with the Department of Army and Defense in

25  Afghanistan, would you explain, please, in that particular

1    project what the expense load was?

2    A.    The expenses were tremendous.  It was much more than we

3    expected when we started.  The air fare -- we had to get --

4    usually, when there was a need for some position, I had to

5    find someone immediately and fly them right away, which

6    basically meant the air fare was usually pretty high.  We had

7    a lot of other expenses which we didn't realize up front that

8    were going to be there, like interpreters.

9           There were vehicles.  Each site needed a vehicle, so

10   we needed vehicles for each of the sites.  There was just

11   office supplies, printers, you know, that kind of stuff.

12          MR. BROOKS:  Well, first, Your Honor, I would offer

13   Exhibit I into evidence, please.

14          MR. CASTLE:  No objection.

15          THE COURT:  I is received.

16          (Defendant's Exhibit I received in evidence.)

17          MR. BROOKS:  Approach the witness, Your Honor?

18          THE COURT:  Sure.

19   Q.    BY MR. BROOKS:  Now, do you recognize Exhibit K,

20   Ms. Auterio?

21   A.    Yes.

22   Q.    And what do those represent?

23   A.    Our tax returns.

24   Q.    And are you familiar with those tax returns?

25   A.    Yes.

1   Q.    Did you help prepare those tax returns?

2   A.    Basically I gave Mark the QuickBooks file, the

3   information, and he prepares them.

4   Q.    And the numbers on those tax returns, were those

5   supplied by you?

6   A.    Correct.  Yes.

7   Q.    And, if you would -- and has American International

8   filed tax returns each and every year that you've been with

9   the company?

10  A.    Yes.  We normally file an extension, but they are

11  filed.  They have been filed every single year.

12  Q.    Now, could you please, for the Court, look in Exhibit K

13  and describe the gross receipts for 2004?

14  A.    2,637,861.

15  Q.    And for 2005?

16  A.    11,764,611.

17  Q.    And 2006?

18  A.    5,231,939.

19  Q.    Now, were the tax returns and the information on the

20  tax returns found in Exhibit K, were those during or before

21  the Afghan contract?

22  A.    Before.

23  Q.    So, the gross receipts had nothing to do with

24  Afghanistan?

25  A.    Correct.

1    Q.    And the revenues on those tax returns, do they

2    represent revenues from the clients you previously described?

3    A.    Yes.  Correct.

4    Q.    And why the difference between 2 million one year and

5    11 million another year?  Do you know?

6    A.    Basically the way the business is, is we have good

7    years, better years, bad years.  Obviously, in 2004, we

8    didn't have much business.  In 2005, we had a major airline

9    that went on strike.  We did a lot of work for them.  In

10   2006, it went down because we actually lost a little over a

11   million dollars because they filed bankruptcy.  So, 2006

12   should have actually been higher.

13   Q.    Now, do you know when American International entered

14   into a government contract in Afghanistan?

15   A.    It was July of 2007.

16   Q.    Okay.  And when did the contract in Afghanistan end?

17   A.    December, 2010.

18   Q.    Now, would you please describe for the Court what you

19   did when you -- as far as expenses you did for Afghanistan?

20   A.    For expenses?  You mean like the expenses we had?

21   Q.    Yes.

22   A.    We had air fare, a lot of air fare.  We had vehicles.

23   We had interpreter fees, as well as office supplies or

24   anything else I was billed for.

25   Q.    And in 2007, did you know the approximate -- was it a

1    pilot program, if you know?

2    A.    Yes.  It was originally started with three guys.  We

3    weren't sure how long it was going to last or, you know,

4    anything, but we gave it a shot.  It was our first venture in

5    that type of work.

6    Q.    What do you mean by your first venture?

7    A.    We had never done -- our work has mostly been security,

8    so this was a little different, where it was more of kind of

9    like a training program, which was not something we had done

10   previously, but we are always up for new opportunities.

11   Q.    And the -- you're familiar with profits, correct?

12   A.    Yes.

13   Q.    Was -- in the beginning of that contract, in 2007, was

14   that a profitable pilot program contract?

15   A.    No.

16   Q.    And why not?

17   A.    When we started, we flew all our guys over.  We weren't

18   quite -- we didn't realize it was going to be the interpreter

19   fees.  We didn't realize we were going to have the vehicles

20   over there.  I hadn't actually received payment until

21   November for when we started.  We started in August.  The

22   first payment I received was in November, so we were

23   basically borrowing on every credit line we could get just to

24   pay our guys to keep them there long enough to receive

25   payment.

1    Q.    Now, in 2007, you had the Melon Bank account, did you

2    not?

3    A.    I did.

4    Q.    Did you draw against the Melon Bank account to pay

5    those expenses?

6    A.    We used everything that we had in there, and we had

7    actually had approximately 200 thousand or so in Bank of

8    America, which I had to take out and put into Melon so that I

9    could pay my guys.  And then we also had to borrow from both

10   Citizens Bank and Bank of America to continue to pay our guys

11   until we were finally paid.

12          MR. BROOKS:  All right, Your Honor, I would offer,

13   by the way, Exhibit K into evidence, please.

14          MR. CASTLE:  No objection.

15          THE COURT:  K is received into evidence.

16          (Defendant's Exhibit K received in evidence.)

17   Q.    BY MR. BROOKS:  Now, that -- would you -- in your mind,

18   was the contract in Afghanistan profitable in 2007?

19   A.    No.  We were in the hole in 2007.

20   Q.    How about 2008?

21   A.    2008, we were pretty much just barely, if 10 percent.

22   It was, you know, still just -- we were still trying to make

23   up for the losses.  We didn't anticipate as much of the

24   expenses that we had when we started.

25   Q.    Now, normally, in international contract security, what

1    is your normal profit margin, if you have one?

2    A.    50 percent.

3    Q.    And do you have an idea of what your profit margin was

4    in the Afghanistan project from 2007 through 2010?

5    A.    2007, I would say we lost.  2008, maybe 10 percent.

6    2009, we started making a little more profit in 2009.  I

7    actually started lowering some of -- we were originally

8    paying the guys between 525 -- some actually got 600 a day.

9    Some were 450 a day.  And then I started -- from a certain

10   point in July of 2009, I started hiring all new hires at a

11   standard 400 a day because the profit wasn't there, and we

12   were killing ourselves, and it wasn't really worth it.

13   Q.    Overall, what would you say the profit margin is

14   for the four years?

15   A.    Well, '07, I say we lost.  10 percent in '08, and maybe

16   20 percent in '9 and '10.

17   Q.    Now, during the period of 2007 through 2010, did

18   you also service other clients?

19   A.    Oh, yes.

20   Q.    So you had your regular run of clients during that

21   period of time?

22   A.    In 2007, if it wasn't for our other clients, we never

23   would have made it to be able to pay our guys because we were

24   using the profits from the oil company.  Because we had a

25   large job in Indonesia, we were using the profits of those to

1    pay the guys in Afghanistan, and I still had to borrow.

2    Q.    Now, the client base that -- strike that.  How

3    important is the $5.3 million to American International

4    Security?

5    A.    Well, without -- without it, basically, there's nothing

6    new we can do.  We are basically at a standstill.  The

7    customers that we have now pay the salaries for our

8    employees, but they don't pay a lot of the overhead, like the

9    insurance, our rent, and there's a lot of other expenses that

10   will pretty much be at a loss.  We rely on other work coming

11   in to basically carry the rest of it.  I mean, we have steady

12   clients but, you know, they pay the salaries, but it doesn't

13   pay everything.

14   Q.    Thank you.  One second, please.  Now, you say you have

15   a line of credit with Bank of America; is that correct?

16   A.    At the present time, yes.

17   Q.    What do you mean "at the present time"?

18   A.    Bank people talk, and I assume that it's only a matter

19   of time.

20         MR. CASTLE:  Objection, Your Honor, to this whole

21   line of questioning about bank people talking to other bank

22   people.  I object to that.

23         THE COURT:  That's sustained.

24   Q.    BY MR. BROOKS:  Without that line of credit, and

25   without the money being returned, what impact would that have

1    on American International?

2    A.    We'd go into debt.

3    Q.    And do you have any other facilities to borrow money?

4    A.    No.

5            MR. BROOKS:   I have no further questions, Your

6    Honor.

7            THE COURT:   Thank you, Mr. Brooks.   You may cross

8    examine, Mr. Castle.

9            MR. CASTLE:   Your Honor, is there any way to take a

10   five minute break?

11           THE COURT:   Let's take ten.

12           MR. CASTLE:   Thank you.

13                      (Short break.)

14           THE COURT:   You may cross examine, Mr. Castle.

15           MR. CASTLE:   Thank you, Your Honor.

16                    CROSS EXAMINATION

17   BY MR. CASTLE:

18   Q.    Ms. Auterio, when it comes to American International,

19   as it stands right now, the doors are still open.   Isn't that

20   right?

21   A.    Yes.

22   Q.    And International -- American International remains in

23   control of all the money it has received since September 8 of

24   2011?

25   A.    We received about 30-something thousand from Melon in a

1    check, which I deposited in Bank of America.  We paid some

2    bills, and I've received 8 thousand plus from one of my

3    regular customers.

4    Q.    The hundred thousand dollars that you got from the

5    government, what happened to that money?

6    A.    We paid our payroll.  We paid our rent, insurance,

7    basically all the bills that were outstanding in

8    QuickBooks.

9    Q.    What account did that go into?

10   A.    Bank of America.

11   Q.    So, to be correct, you can say that what you've done is

12   you've shifted your business to Bank of America?

13   A.    We had no choice.  Yes.

14   Q.    The Bank of America account, that's one you've had for

15   some time?

16   A.    Yes.

17   Q.    You have a good working relationship with Bank of

18   America?

19   A.    It's not the same.  I mean, there's no personal

20   service.  I mean, it's an account we had.  It's open.  So,

21   from default, we basically had no choice but to use it.

22   Q.    Melon Bank is not the only bank in Boston, correct?

23   A.    Melon Bank is not, no, but it's the most --

24   Q.    There's other banks in Boston?

25   A.    Absolutely.

1   Q.    And when it comes to Melon Bank, really it is one you

2   liked because you had a personal relationship with them,

3   correct?

4   A.    I liked the personal relationship, yes.

5   Q.    It doesn't mean you couldn't develop that personal

6   relationship with another bank, like Bank of America?

7   A.    No, I couldn't.  They don't have that type of service.

8   I've had my account at Bank of America, and the branch

9   manager had tried to convince me to switch over before, and I

10  told her that they didn't have the type of personal service

11  that I got from Melon, and she agreed that they did not have

12  that.

13  Q.    When you say "personal service," tell me what you mean.

14  They are not as friendly?

15  A.    They are not as friendly.  For the most part, I sent a

16  lot of wires, so the normal procedure was, I would fax a wire

17  over to Melon.  They would call me, confirm it and send it.

18  It was very easy, and if I would call at any time the bank,

19  they always knew who I was.  I didn't have to say, "This is

20  Barbara from American International."  I would say hello, you

21  know, and they knew immediately who I was.  I would go in.

22  They always knew me.  There was never a line.  It's a

23  different type of bank.  It's more personal.

24        And, with Bank of America, they don't -- you can't

25  just fax a wire.  Right now, I'm just waiting to get set up

1    to at least be able to do wires.  I'm not even sure of their

2    process.  But, with Melon, it was very easy and very -- I

3    could call them and ask for anything and if a check was

4    cleared.  They would do anything.

5    Q.    From your perspective, then, what you're saying is

6    Melon Bank made your job easier?

7    A.    Yes.

8    Q.    Working with Bank of America or Citizens Bank or

9    another bank, it doesn't mean that having -- or using them as

10   a bank would make it impossible for you to perform your

11   duties, it wouldn't be as easy?

12   A.    It wouldn't be as easy, but Melon didn't charge me for

13   wires, where Bank of America will.

14   Q.    Ever have a line of credit with Melon Bank?

15   A.    No.

16   Q.    Why not?

17   A.    Melon is a trust.  It's not a commercial type -- they

18   don't have that.

19   Q.    The line of credit that you have with Bank of America,

20   how much is that line of credit?

21   A.    1.2 million.

22   Q.    In fact, that line of credit is not in the name of

23   American International, is it?

24   A.    Honestly, I'm not sure.  It may be under Michael

25   Taylor, and it might have both names on it.  I would have to

1    look at the paperwork again.

2    Q.    If I were to tell you it was in the name of Michael

3    Taylor, you would have no reason to disagree with me, would

4    you?

5    A.    No.  He probably guaranteed it or something.

6    Q.    Since the government seized the 5.3 million from

7    American International, American International has remained

8    in control of its accounts receivables, correct?

9    A.    Correct.

10   Q.    In fact, American International provided some services

11   to a news organization in Libya?

12   A.    Correct.

13   Q.    And, as a result of that, you are owed at least -- have

14   been recently or now are owed a hundred thousand dollars?

15   A.    Correct.

16   Q.    Has that money been paid?

17   A.    No.  Not yet.

18   Q.    When is that money going to be paid?

19   A.    I mean, I can't guarantee when they are going send it.

20   The terms are 30 days, but it's when they pay it, basically,

21   when I receive payment, and it will be via ACH, directly into

22   Bank of America.

23   Q.    The hundred thousand dollars that you're owed -- and

24   when I say "you," I apologize, I mean American

25   International -- it's not past due, right?

1  A.    It may technically be.  I believe I sent it -- you

2  know, I don't remember the exact date that I sent it, but

3  they are a steady client, so if it's a little over, I mean,

4  usually if it goes too far, I will send another e-mail to the

5  person and, could you check on this for me?  But it may be a

6  little past due.

7  Q.    So, what you just said, they are a regular customer,

8  correct?

9  A.    Yes.

10  Q.    And, as a regular customer, they have regularly paid

11  their bills?

12  A.    They have regularly paid their bills.

13  Q.    And they paid their bills regularly on time?

14  A.    Or close to.  I mean, sometimes it's a little late,

15  but...

16  Q.    When you say "a little late," how many days are we

17  talking about?

18  A.    I'm talking -- I mean, there's been times it's been a

19  couple months late.  I mean, sometimes it's on time, within

20  30 days.  Sometimes I've had -- actually had a few that were

21  a couple months late.

22  Q.    And so, in fact, this payment could be in your American

23  International account as we're speaking right now?

24  A.    No, because I receive e-mails with the remittance, and

25  I checked my e-mails this morning because I had a remittance

1    from them to see what it was, and the amount was 8 thousand

2    and change.  So, I was checking to see if that actually came

3    in.

4    Q.    And you're checking because this $100 thousand, you're

5    anticipating receiving it pretty darn soon here?

6    A.    I'm hoping, yes.

7    Q.    Okay.  Since the seizure of the $5.3 million, American

8    International has maintained its relationship with its

9    current customers?

10   A.    Yes.

11   Q.    In fact, as you have testified, American International

12   has also sought out new customers?

13   A.    We had been seeking out new customers, obviously, prior

14   to this.

15   Q.    But the fact that the 5.3 million was seized from

16   American International hasn't affected that in any way,

17   correct?

18   A.    At the moment, no one knows, so, no.

19   Q.    Do you have any evidence whatsoever that, because the

20   $5.3 million was seized, it will affect your relationship

21   with these prospective clients?  Yes or no?

22   A.    No.

23   Q.    You remain in control of the business location,

24   correct?

25   A.    Yes.

1   Q.    Your office equipment?

2   A.    Our office equipment is leased, but yes.

3   Q.    Your office supplies?

4   A.    Yes.

5   Q.    You remain in control of the ability to borrow $1.2

6   million from Bank of America?

7   A.    Yes.

8   Q.    In fact, as you've stated, American International has

9   an A+ rating?

10  A.    Yes.

11  Q.    Has any efforts been made by American International to

12  see if they could get more credit?

13  A.    Not at the moment, because I would have to provide a

14  balance sheet, and with no balance, I mean, they would laugh

15  at me.

16  Q.    How do you know that?

17  A.    I mean --

18  Q.    Have you had that experience before?  Have you walked

19  in --

20          THE COURT:  Wait just a second.  You asked a

21  question.  She started to answer it.  You interrupted her.

22  So let her answer the first question you asked before you ask

23  another one.

24          THE WITNESS:  Thank you.

25          THE COURT:  Do You have in mind the first question

1    he asked?

2           THE WITNESS:  Yes.

3           THE COURT:  All right.  Go ahead and answer that

4    question.

5           THE WITNESS:  When we had accounts at -- when we had

6    a loan through citizens at the very beginning of the

7    Department of Army contract, 2007, we had a

8    hundred-thousand-dollar credit.  We didn't have much of a

9    balance.  We asked for an increase in that credit.  They

10   asked for a balance sheet.  They denied us.  We didn't have

11   enough Monday, so they weren't going to give us anymore

12   credit, so I know that, without a balance, I'm not going to

13   get credit.  And, luckily, I -- we knew my Bank of America

14   paperwork had supplied the balance sheet when I actually had

15   money or they would not have.

16   Q.   BY MR. CASTLE:  So, what you know is, at least when it

17   comes to Citizens bank?

18   A.   Well, I mean --

19   Q.   Yes or no?

20   A.   Yes.

21          THE COURT:  You don't control the witness' answers.

22          If you need to explain an answer, you explain it.

23   I've never permitted somebody to bludgeon somebody into a yes

24   or no answer.  You can answer the question, and you can

25   explain it.

1          MR. CASTLE:  Well, Your Honor my --

2          THE COURT:  So, what's the question?

3          MR. CASTLE:  Well, my questions are, I believe,

4    structured for either a yes or no answer

5          THE COURT:  Well, very few questions are properly

6    answered yes or no, in my view, so however you structure

7    them, I'm going to let her answer, and if she wants to

8    explain them, I'm going to let her explain them, just as I

9    would if your opponent were trying to do the same thing.

10         MR. CASTLE:  Well, my question was, her experience,

11   when it came to the A+ rating and not having a balance sheet,

12   has been limited to Citizens Bank?

13         THE WITNESS:  Could you ask that again?

14   Q.   BY MR. CASTLE:  The experience that you've had, without

15   having an adequate business -- or excuse me -- an adequate

16   balance sheet where you've gone to obtain a loan, has been

17   limited to Citizens bank?

18   A.   That was the only one I applied to, yes, but the

19   purpose of a balance sheet is obviously -- I mean, the bank

20   wouldn't request it if -- we are a service company.  We have

21   no other assets.

22   Q.   When it comes to the Bank of America --

23   A.   Uh-huh.

24   Q.   -- was there a time, shortly after the seizure of the

25   money to Melon Bank -- or from Melon Bank, that a cashier's

1    check was written to the law firm of Deutsch Williams?

2    A.    Yes.

3    Q.    Do you recall how much that --

4    A.    Yes.

5    Q.    -- cashier's check was for?

6          THE COURT:  Let him finish his question before you

7    answer it.

8          THE WITNESS:  Sorry.  I believe it was approximately

9    133, something around that number.

10   Q.    Do you know if it was an odd number that was written to

11   the law firm?

12   A.    I mean, I don't remember the exact dollar amount.  It

13   was, like, 133 plus, you know, that's not really exact.

14         THE COURT:  You mean 133 thousand?

15         THE WITNESS:  Yes.

16         MR. CASTLE:  Your Honor, if I could have an Exhibit

17   marked.  You have what I would mark as Plaintiff's Exhibit 1,

18   if I could.

19         THE COURT:  One?

20         MR. CASTLE:  Plaintiff's Exhibit Number 1, or

21   Government's Exhibit Number 1 is fine.

22   Q.    BY MR. CASTLE: Ms. Auterio, let me hand you what's been

23   marked as Government's Exhibit number 1 and ask you if you

24   recognize that exhibit?

25   A.    Okay.

1    Q.    Is that the cashier's check that was written out to

2    Deutsch Williams?

3    A.    Yes.

4    Q.    And what amount is stated in that cashier's check?

5    A.    $133,275.88.

6    Q.    And what was the purpose of providing a cashier's check

7    to Deutsch Williams?

8    A.    We had to retain an attorney to basically find out what

9    happened.

10   Q.    How was that amount determined?

11   A.    There was no rhyme or reason, no logic to it.  I left a

12   portion -- I can't remember exactly what -- in the account,

13   and I wrote the rest out to Deutsch Williams and brought it

14   over to their office.

15   Q.    Was that check supposed to serve as a retainer?

16   A.    Legal service, accounting, basically our defense and

17   finding, you know, what happened because, at that time, all I

18   knew from Melon -- they just called and told me that our

19   funds had been seized.  We had no other information.  They

20   wouldn't give us any information, so the first thing I did

21   was called Deutsch Williams.

22   Q.    And then the second thing you did was get them a

23   cashier's check?

24   A.    Correct.  Same day.

25   Q.    And this is after you learned that the money had been

1    seized at Melon Bank?

2    A.    Correct.

3    Q.    At the time that you had that cashier's check drawn,

4    were you aware of the balance in the Bank of America account?

5    A.    Yes.

6    Q.    Can you tell me what the balance was?

7    A.    I mean, I don't know it right now off the top of my

8    head, and I don't even recall how much I left in there.  It

9    wasn't a lot more.  I mean, I left a minimal balance just to

10   keep that account open in case we needed it because, at the

11   time, I didn't know we were not going to be able to use Melon

12   Bank.

13   Q.    So you withdrew all but the minimum balance required --

14   A.    All but --

15   Q.    -- to keep the account open?

16   A.    No.  I --

17             THE COURT:  Wait until he finishes his question.

18             THE WITNESS:  Sorry.  I didn't know what the minimum

19   balance was to keep the account open.  I just left -- I mean,

20   it was just like a random amount.  There was no, you know...

21   Q.    But you left a balance in the account --

22   A.    I left a balance in the account --

23   Q.    -- to make sure --

24   A.    -- to keep it open.

25             THE COURT:  Are you going to offer 1?

1          MR. CASTLE:  Yes, Your Honor, if I could.

2          MR. BROOKS:  No objection, Your Honor.

3          THE COURT:  1 is received into evidence.

4          (Government's Exhibit 1 received in evidence.)

5   Q.    BY MR. CASTLE:  So, at the time that the money was

6   seized out of the Melon Bank --

7   A.    Uh-huh.

8   Q.    -- in the Bank of America account, there was at least

9   $130 thousand?

10  A.    Correct.

11  Q.    And then, at some subsequent time, you received some

12  additional funds?

13  A.    Yes.

14  Q.    How much?

15  A.    Well, after the first week, Deutsch Williams sent me 40

16  thousand so that I could make my payroll.  I believe it was

17  about two weeks later, they sent me around a hundred thousand

18  so that I could pay my rent, payroll again.  Two more weeks

19  had gone by.  I paid my rent, my insurance, some bills, and I

20  received 30 -- a check for 30 plus -- I don't remember the

21  exact amount -- from Melon, and I also deposited that into

22  Bank of America.

23  Q.    So, after the seizure, based on the money that was in

24  the Bank of America account, the money that was returned, you

25  were able to meet the expenses of American International?

1    A.    Currently, yes.

2    Q.    When it comes to the seizure at Melon Bank, if we could

3    turn to -- have as Exhibit A, Your Honor -- if I could have

4    that marked as an Exhibit.

5              THE COURT:  Eight?

6              MR. CASTLE:  A.

7              THE COURT:  A?  No.  We already --

8              MR. CASTLE:  A, I don't believe, has been

9    admitted.

10             MR. BROOKS:  My Exhibit A?

11             THE CLERK:  We don't need to remark.

12             MR. CASTLE:  We could leave it as Exhibit A.

13             THE COURT:  Is this his Exhibit A?

14             MR. BROOKS:  Yes.

15             THE COURT:  So, to avoid confusion you previously

16   wanted us to avoid.

17   Q.    BY MR. CASTLE:  Ms. Auterio, if I could hand you

18   Exhibit Number A and ask you if you recognize that document?

19   A.    Okay.

20   Q.    Is that a document that you provided?

21   A.    Yes.  This is the document I received from Melon

22   Bank.

23   Q.    Was it a document that you requested?

24   A.    Yes.

25   Q.    And the purpose of the request was what?

1    A.    Basically to find out how much was seized, and I needed

2    to know what checks had bounced.

3    Q.    And does that document reflect the number of checks

4    that bounced?

5    A.    On this date, as of September 27.

6    Q.    And the number of checks that bounced on that date were

7    how many?

8    A.    Let's see.  It looks like five

9    Q.    What was the total?

10   A.    I don't have a calculator here, but less than a

11   thousand.

12   Q.    All right.  So, as a result of the seizure, only five

13   checks of less than a thousand dollars bounced; isn't that

14   right?

15   A.    As of September 27.  Anything that would -- I mean, I

16   don't have anything that would have bounced after the 27th.

17   I know there are other checks that were outstanding.

18   Q.    That bounced?

19   A.    Well, they would have to because Melon closed our

20   account.

21   Q.    But didn't Melon provide a grace period prior to

22   closing the account to cover checks?

23   A.    Up 'til September 27.  And that's when they sent it

24   back.  So, anything that had not cleared as of this date.

25   This is the last date that they had.  They sent me back the

1    check, which I deposited, but I know that -- I mean, not

2    everyone cashes their checks right away, and I know that

3    there are a few checks that are not clered that are not on

4    this list.

5    Q.    But, according to Bank -- Melon Bank's records, there

6    was only four checks that bounced, of less than a thousand

7    dollars?

8    A.    As of September 27, yes.

9    Q.    And the seizure occurred on September 7, correct?

10   A.    I believe so.

11   Q.    So, during that period of time, according to Melon

12   Bank, only four checks bounced?

13   A.    Yes.

14   Q.    And then you mentioned that you had received a letter

15   from Melon Bank indicating that they were terminating their

16   relationship, correct?

17   A.    Yes.

18   Q.    The letter also indicated how long they would keep the

19   account open, correct?

20   A.    Yes, it did.

21   Q.    It also indicated that whatever money they received in

22   the account after the account was closed, that they would

23   give to American International?

24   A.    Yes.

25   Q.    That amount totaled approximately $35 thousand?

```
1    A.    Yes.
2    Q.    It's that $35 thousand that you put in the Bank of
3    America account?
4    A.    Correct.
5    Q.    Ms. Auterio, if we could turn to Exhibit F, which I
6    believe has already been given to you up there.
7               THE COURT:  Are you going to offer A?
8               MR. CASTLE:  Yes, Your Honor, if I could.  Thank
9    you.
10              THE COURT:  I would assume there's no objection,
11   Mr. Brooks?
12              MR. BROOKS:  No objection.
13              THE COURT:  Since it's one of yours.
14              MR. BROOKS:  No objection.
15              THE COURT:  Exhibit A is received.
16              (Defendant's Exhibit A received in evidence.)
17   Q.    BY MR. CASTLE:  As you've already indicated, this is a
18   document that you prepared?
19   A.    Uh-huh.
20   Q.    And this document represents the budget for American
21   International?
22   A.    Correct.
23   Q.    Correct?  In fact, I believe your statement was, this
24   is what we pay on a monthly basis, correct?
25   A.    Correct.
```

1    Q.    And some of these expenses you have here are expenses

2    that are due every month, correct?

3    A.    I'm sorry?

4    Q.    Some of the expenses you've listed on the budget here

5    are expenses that you have every month?

6    A.    Yes.  Absolutely.

7    Q.    But, as you've indicated, some of these are just

8    estimations of what you might need as a product of averaging

9    for some period of time?

10   A.    Correct.

11   Q.    Included in your budget is a Chapter S Corp.

12   distribution of $20 thousand?

13   A.    Correct.

14   Q.    And that goes to Michael Taylor?

15   A.    Yes.

16   Q.    So, what you're saying is that, after all the expenses

17   are paid, that's when the distribution to Mr. Taylor is made?

18   A.    Yes.

19   Q.    If we could turn to Exhibit G -- oh, let me just -- if

20   I could just ask you one more question.  I'm sorry.  On

21   Exhibit F, your monthly budget, then, is $206,617?

22   A.    Yes.

23   Q.    And then, going to Exhibit G, if I could have you look

24   at the top of that Exhibit.

25   A.    Uh-huh.

1    Q.    And if you could go over to the left portion, toward

2    the top there, what you -- did you prepare this document, by

3    the way?

4    A.    I did, yes.

5    Q.    And what you have done is you've divided up current

6    clients with prospective clients, correct?

7    A.    Yes.

8    Q.    And you have a column there identified as monthly?

9    A.    Yes.

10   Q.    Identifying the amount that is received monthly from

11   these current clients?

12   A.    Yes.

13   Q.    Totaling $226,813, correct?

14   A.    Now, these clients that you have here -- and I don't

15   know if we need to go one-by-one or you whether you can

16   categorize them -- how long have you had this list of

17   clients?

18   A.    Some are new.  Some we've had since 2001.

19   Q.    But you consider them current clients?

20   A.    There's a couple that were one-time-only clients, but I

21   put them on here because we did get enough income from them,

22   even at that one time, like it says, NAR, 8,161.  That was a

23   one-time client.  It shows to the far right.  But we

24   occasionally do get one-time clients in a month period.  They

25   might only be for that one month.  We may not have them the

1   next month.  And then, the month after, we may have another

2   one-time.  It's kind of variable.

3   Q.    In fact, that's the nature of American International's

4   business?

5   A.    Yes.  I mean, we can't predict.

6   Q.    But what you've done here on Exhibit G, you've

7   presented clients that -- some of which you've had since

8   2001?

9   A.    Correct.

10  Q.    And some of which you have had dealings with, is it

11  fair to say, recently?

12  A.    Yes.

13  Q.    For example, that very first one -- and I'm sorry, I

14  have a hard time reading that.

15  A.    It says News.

16  Q.    Is that one of those clients you've had since 2001?

17  A.    I think they were probably around 2004, but it was

18  pretty long-term.

19  Q.    And maybe what you could do -- I know you've alredy

20  identified one as kind of a one-job arrangement.  Can you

21  identify all the others which you have had a long-term

22  relationship with?

23  A.    Sure.  The first one, which is News, we have a

24  long-term relationship with them.  There's is an average

25  monthly because, depending on what's happening with the news

```
 1   media, we either may have work in any given month or may not.
 2   The second one, AC, that is a relatively new client we picked
 3   up to do charters, and depending on how their sports team
 4   does depends how much work we will get from them.
 5   Q.    If I could just stop you there for a minute.   That
 6   relates to the National Hockey League?
 7   A.    Yes.
 8   Q.    Okay.
 9   A.    We just provide screening service so, when they fly in,
10   they have to be screened before getting on the plane, so we
11   provide that service.   And if their team does well and they
12   keep coming back to Boston, we will screen them more often.
13         The next one, monthly 250 -- I can't even read the
14   initial it says.   That's also another -- I mean, it could be
15   a one-time-only client.   They could end up continually using
16   us.   They are relatively new as well.   The next one down, FE,
17   a thousand dollars.   When the circus comes in or the Ice
18   Capades come in, we provide security service, one guard
19   during their show.   That's normally twice a year, so it
20   averaged out to approximately a thousand.   We have had them
21   probably three or four years now.
22         The next one down, GEP, 2,600, we are expecting they
23   are also another new client that we just received regarding
24   airport screening, and we are hoping their team does well and
25   they come to Boston a lot.   The next one down, MPI,
```

1   69 thousand, that is a customer that we have an open contract

2   with, but currently no job orders listed are presumably

3   future expected, so...

4   Q.    And could I just ask you one question about that

5   69,652.  Based on the work that you've gotten from them in

6   the past, that has been the monthly average income that

7   American International has received?

8   A.    Yes.  Up to September.  Correct.

9   Q.    And would it be correct that you do anticipate

10  receiving work from them in the upcoming -- in the future?

11  A.    We hope to.  I mean, we have no current job orders,

12  and, at the moment, we still have an open contract, so we are

13  hoping, yes.

14  Q.    How long have you had that relationship with them?

15  A.    That particular, MPI, is the customer abbreviation, and

16  probably they would probably have been a customer for about

17  five years or so.

18  Q.    And if you would just keep going down.

19  A.    It looks like MAL, that is also a charter company.

20  Again, depending on how their sports team does, we are hoping

21  to get at least that monthly.  MGT, also another charter

22  company at the airport.  We just picked up more work with

23  them.  NAR --

24  Q.    I think you've talked about that one.

25  A.    Okay.  One-time client.  AFS, 37 thousand.  That was

1    also based on 2011 activity.  Let's see --

2    Q.    How long have you had that client?

3    A.    That one is relatively new.  I'm sorry.  That one is

4    the airport.  It's kind of hard because it's so small, so I'm

5    trying to go by the numbers.  That one is the airport, and

6    that was the client we've had since September, 2001.  So we

7    expect that to continue.

8    Q.    Now, are you referring to the one that said -- has the

9    figure $37,467?

10   A.    Yes.  That's correct.

11   Q.    Thank you.

12   A.    And the one underneath that, that is part of that same

13   company, SSF, 2,004.78, that is basically the same branch of

14   that same company, so we expect that as well.  USA is a new

15   charter company as well, and we are hoping to pick up more

16   work from them; again, depending on sports.  WABC, 29,946.

17   They have been a customer probably seven or eight years now,

18   and we do expect to continue to work for them.  And WTS,

19   1,794, they were a new client.  I don't expect anymore work

20   from them, but anything is possible.

21   Q.    Now, just to make sure that I understand these figures,

22   what you've done is you've taken the total amount of money

23   received by American International by these clients, and

24   you've divided it by 12 to get a monthly figure?

25   A.    Correct.

1    Q.    Would that be right?  Am I understanding that

2    correctly?

3    A.    Yes.  Correct.

4    Q.    Because I notice that, with some of these contracts, as

5    you've indicated, they involve hockey?

6    A.    Yes.

7    Q.    Now, unfortunately, hockey isn't as a big sport out

8    here in the west as it is in the east, but hockey --

9              THE COURT:  Don't tell that to the Grizzly's fans.

10             MR. CASTLE:  I don't suppose there's any Grizzly's

11   fans here.

12   Q.    BY MR. CASTLE:  But when it comes to hockey and

13   providing this contract service for them, it's service that

14   you're providing during the hockey season?

15   A.    Correct.

16   Q.    And the hockey season starts, what, October,

17   November?

18   A.    Correct.  So the next few months.

19   Q.    Right.  So what we're really talking about is income

20   right now that is going to be coming into the door to

21   American International in October, November, December,

22   January, February -- well, during the hockey season?

23   A.    During the hockey season, depending on how the

24   different teams do.

25   Q.    So, if you were to look at the books of American

1   International for these contracts involving hockey, seasonal

2   sports, it's going to be higher during those seasons?

3   A.    A little.  I mean, it's not a huge job, so even though

4   we may have a couple charters -- so, if that particular

5   charter company comes in three or four times, that will be

6   three or four times probably at best, so it's not going to

7   reach the 29 thousand like, say, our are airport job did, but

8   we'll get a little bit.

9   Q.    Maybe the point I'm making -- and let's see if you'll

10  agree with this -- even though you've provided an Exhibit G

11  here with a monthly figure --

12  A.    Uh-huh.

13  Q.    -- it's just an average of 12 months.  It doesn't

14  necessarily represent the timing of when you actually receive

15  the payment?

16  A.    No.

17  Q.    Now, according to Exhibit G there on monthly income,

18  you've indicated $226,813; is that correct?

19  A.    Yes.  That's correct.

20  Q.    Now, in looking at current clients, it appears that

21  there's only one client, the very first one, where you

22  actually have to pay the payroll of the security person.  Am

23  I right about that?

24  A.    Well, it's different.  The very first one, which is

25  News, we use contractors because, I mean, it's not a

1    steady -- it's not steady work.  They are not a W-2.  They

2    are a 1099.  So that first one of that 69,000, I would pay

3    those guys a 1099 because their days could vary.  I mean, I

4    don't know how long it's going to pay or how much they will

5    work.

6         The rest from the columns down are all people who

7    are W-2's, are employees, and they get paid through our

8    payroll company, SW-2.

9    Q.    Thank you.  And that would be reflected in Exhibit F,

10   correct, when you're talking about the W-2 employees?

11   A.    Yes.  I mean, obviously --

12   Q.    And if you turn to.  Could I have you turn to Exhibit F

13   if you haven't done so?

14   A.    Yes.  I have it.

15   Q.    And could you identify for us which categories we're

16   talking about when we're talking about these W-2 employees --

17   A.    The W --

18   Q.    -- on Exhibit F?

19   A.    The W-2 employees are under payroll.  It's the 83,333.

20   However, if I do get more charters, more income, more

21   payroll, so I'm going to have to pay.  If I have five more

22   charters, my payroll could go up a little.  It will go up a

23   little.  Down further there is --

24   Q.    I have another question.  Are you looking for payroll

25   for contractors?

1   A.    Payroll for contractors is the 1099 guys which would be

2   under the 69 thousand.  At the very top, it says News 69

3   thousand.  It shows that they are paid by 1099.

4   Q.    Okay.

5   A.    On Exhibit -- I believe it was G.  So, they are the

6   people who travel with the News, depending on how much they

7   travel, how much they work.  Basically the 20,795 is kind of

8   like averaged out, just like the 69 thousand is.  So the

9   difference between the 69 and the 20 is the rough estimate of

10  the profit on that particular job.

11  Q.    Okay.  So the payroll that you have on Exhibit G for

12  News is actually incorporated back into Exhibit F, your

13  budget?

14  A.    That's correct.

15  Q.    Under the category of payroll for contractors, MNMAR,

16  LH and HS?

17  A.    Correct.

18  Q.    Ms. Auterio, when it comes to these prospective

19  clients --

20  A.    Uh-huh.

21  Q.    -- we've had some discussion about that.  Are any of

22  those prospective clients contractually obligated to American

23  International for American International to provide a service

24  to them?

25  A.    At the moment, no.

1    Q.    Now, we had some discussion about the Afghan contract,

2    and you indicated that there were some costs that you had not

3    anticipated related to that contract?

4    A.    Correct.

5    Q.    Is it also true that it wasn't anticipated, initially,

6    how long the contract would go for?

7    A.    Correct.

8    Q.    And, because of that, that required American

9    International to advance more costs than it had anticipated?

10   A.    With every job we do.  Yes.

11   Q.    I'm sorry?

12   A.    With every job we have the costs up front before we get

13   paid, yes.

14   Q.    Okay.  When it came to the Afghan contract, the way you

15   dealt with the unanticipated costs and the extension of the

16   contract was to borrow on the line of credit with Bank of

17   America?

18   A.    And to use the profits from my other customers.

19   Q.    So, you didn't borrow money from Bank of America to

20   front costs for the Afghanistan contract?

21   A.    I did.  I mean, it was several months before we

22   received payment.  So, I mean, payroll increased quickly, and

23   I couldn't pay payroll and fly guys out there just from the

24   200 thousand that was with Bank of America.  My payroll was

25   over 200 thousand, so every two weeks, I was needing 200

1    thousand to pay, so whether it came from one of my -- the

2    profits from one of my other customers or a loan, it was

3    basically juggling to pay it.

4    Q.    What you're saying to me is, you used a combination.

5    You used the profits made on current clients and the

6    borrowing of money from Bank of America to handle the costs

7    related to the Afghanistan contract?

8    A.    Yes.

9    Q.    In fact, wouldn't it be true that, historically, you

10   have relied on the profits of current clients to advance

11   costs for new clients?

12   A.    Correct.  Yes.

13   Q.    And I believe that there was some testimony earlier

14   that, when it comes to non-government type contracts, that

15   the profit margin for American International on all other

16   contracts is about 50 percent?

17   A.    Correct.

18   Q.    If I could ask you about Exhibit I because I'm not sure

19   I understand Exhibit I.

20   A.    Got it.

21   Q.    Tell me what Exhibit I is again.

22   A.    Exhibit I would be -- so, on my Exhibit G or State's

23   Exhibit G, whichever it is, there's the prospective clients,

24   DE.  So, in order to start up this project, I would need to

25   fly my guys over there.  I would need insurance.  I would

1    need equipment.  I would need telephones.  I would need

2    office supplies.  I would need to get them insurance, and I

3    would need to pay them, which is actually not even on here.

4    So, I would need to front that operation just as I did with

5    the Afghan contract, need to front it with some funds, which

6    we normally would have drawn from our bank account, Melon, to

7    be able to get this going.

8    Q.    Does Exhibit I represent the costs for each prospective

9    client?

10   A.    For each of these new prospective clients, yes, because

11   they are all that same type of work.  They are all basically

12   in a foreign country; set up, flying my guys all over there.

13   They are going to need to a place to stay.  They are going to

14   need vehicles.  They are going to need security with them.

15   So they are all the same type, so they would all need these

16   expenses listed on Exhibit I, as well as payroll.

17   Q.    And is Exhibit I -- is that an annual figure, a yearly

18   figure?

19   A.    It's a monthly.  So, lodging would be 12 thousand

20   monthly.  Some of the expenses are annual, like the

21   insurance, I would only have to pay, like, once for that job,

22   but health insurance I would pay monthly.

23   Q.    What about air fare there?

24   A.    Air fare is four times a year.  The guys work 90 days,

25   have two days -- they call it R & R. -- two weeks off and 90

1    days on, two weeks off.  So if I have four guys there, every

2    90 days someone will be off.

3    Q.    So, how is that air fare $35 thousand a month, then?

4    A.    They fly business class.  It's in the contract.  So

5    they fly business class, and there will be a minimum of four

6    guys, so...

7    Q.    Every 90 days?

8    A.    Yes.

9    Q.    Now, on Exhibit G, there is a -- there's one column, if

10   I could just briefly talk about it, for prospective clients?

11   A.    Uh-huh.

12   Q.    It's on the right-hand -- far right-hand side.  It's --

13   you know, it's on the second half of that document.  There on

14   the left -- excuse me, the far right-hand side, it says

15   number of months?

16   A.    Uh-huh.

17   Q.    And underneath that it lists the numbers?

18   A.    Yes.

19   Q.    So does that indicate the number of months for each

20   contract?

21   A.    No.  Basically that would indicate the number of months

22   through the end of 2012.  So, that first contract would not

23   start until October.  There would be ten months until that

24   end of the year, and then the next one, our expected start

25   date is February, so there would be seven.  Then the next one

1   we expect to start in March, so it would be six months.  But

2   we are hoping to have at least a year contract with each.

3   Q.    For each one.  And so the ten and the seven months

4   represents what's left in the year?

5   A.    Correct.

6   Q.    Now, Ms. Auterio, when it comes to the tax returns,

7   you've talked about, I believe, the 2004, 2005, and 2006 tax

8   returns?

9   A.    Yes.

10  Q.    And you made some statements with respect to those,

11  that you're the one who provides the financial information to

12  the accounting firm, and then the accounting firm provides

13  the information back to you in the form of a tax return?

14  A.    Correct.

15  Q.    When it comes to this 2007, do you know what the gross

16  profits were for 2007?

17  A.    I'd have to look, but let me check.  Oh, 2007, I don't

18  have.  I don't know off the top of my head, no.

19        MR. CASTLE:  Your Honor, if I could have this tax

20  return marked as Plaintiff's Exhibit -- I think it's 2.

21        THE COURT:  Two?

22        MR. CASTLE:  Uh-huh.

23        THE COURT:  This is a different year than K covered,

24  right?

25        MR. BROOKS:  Correct.

1          THE COURT:  And A is the 2007 return?

2          MR. CASTLE:  Yes, Your Honor.

3          THE COURT:  And I assume there is no objection?

4          MR. BROOKS:  No objection, Your Honor.

5          THE COURT:  So A (as spoken) is marked and received

6     into evidence.

7          (Government's Exhibit 2 received in evidence.)

8    Q.    BY MR. CASTLE:  Ms. Arterio, I'm presenting you what's

9    been marked as Plaintiff's Exhibit Number 2.  On line 3 it

10   shows the gross profit; is that right?

11   A.    Yes.

12   Q.    Of $3,329,457, correct?

13   A.    Yes.  Correct.

14   Q.    And then on line 21 it shows ordinary business income

15   of $275,762, correct?

16   A.    I'm sorry.  Which line was that?

17   Q.    That would be line 27.

18   A.    Twenty-one?

19   Q.    Line 21.  I'm sorry.  Did I say 27?

20          THE COURT:  You said 21 the first time and then 27

21   and now we're back to 21.

22          THE WITNESS:  It's 21.  Yes.  I see that.

23   Q.    BY MR. CASTLE:  So, you had testified that in '07,

24   actually, American International had lost money?

25   A.    Yes.

1    Q.    This indicates that their ordinary business income was

2    $275 -- excuse me, $275,762?

3    A.    Yes.

4         MR. CASTLE:  Your Honor, if I could have another

5    Exhibit marked.

6         THE COURT:  This is three, I assume?

7         MR. CASTLE:  Yes.  Exhibit -- Your Honor, this is

8    the tax return for 2008.  I would have it marked as

9    Plaintiff's Exhibit Number 3.

10        THE COURT:  Mr. Brooks, I assume no objection?

11        MR. BROOKS:  No objection.  I'm sorry.  No

12   objection, Your Honor

13        THE COURT:  Three is received, the tax return for

14   2008.

15        (Government's Exhibit 3 received in evidence.)

16   Q.   BY MR. CASTLE:  Ms. Arterio, let me hand you this tax

17   return.  Have you seen this tax return before?

18   A.    I'm sorry?

19   Q.    Have you seen that tax return before?

20   A.    I'm sure I have.

21   Q.    In fact, in 2008, it shows that the gross profit was 14

22   million 599 dollars 700 -- excuse me -- 14,500,000 -- 599

23   thousand 729 dollars?

24   A.    Correct.

25   Q.    And that the ordinary business income, which is line

1    21, shows a number of $2,000,148 and -- $2,148,158?

2    A.    Yes.

3          MR. CASTLE:  Another Exhibit to be marked, Your

4    Honor, which would be the 2009 tax returns.

5          THE COURT:  Exhibit 4?

6          MR. BROOKS:  No objection, Your Honor.

7          THE COURT:  Four is the 2009 return and is

8    admitted.

9          (Government's Exhibit 4 received in evidence.)

10   Q.    BY MR. CASTLE:  Ms. Auterio, let me show you what's

11   been marked as Government's Exhibit 4.  Have you seen that

12   Exhibit before?

13   A.    Yes.

14   Q.    Is that a tax return?

15   A.    Yes.

16         THE COURT:  Is that a tax return?  Did you answer

17   that yes?

18         THE WITNESS:  Yes.

19   Q.    BY MR. CASTLE:  And that's for 2009, correct?

20   A.    Yes.

21   Q.    And that shows here, on line 3, gross profit of

22   $24,842,088?

23   A.    Yes.

24   Q.    And on line 21, ordinary business income, it shows

25   $4,000,242 -- excuse me, $4,242,421?

```
 1   A.    Yes.

 2            MR. CASTLE:  And one more Exhibit, Your Honor.  That

 3   would be the 2010 tax return.

 4            THE COURT:  Exhibit 5?

 5            THE CLERK:  Yes.

 6            THE COURT:  Exhibit 5 is received.

 7            MR. BROOKS:  No objection, Your Honor.

 8            THE COURT:  The 2010 return.

 9        (Government's Exhibit 5 received in evidence.)

10   Q.    BY MR. CASTLE:  Ms. Auterio, all the tax returns I've

11   been showing you, they relate to the tax returns for American

12   International?

13   A.    Okay.

14   Q.    Is that correct?

15   A.    Yes.  I believe so.

16   Q.    Let me hand you what's been marked as Exhibit Number

17   10.

18            THE COURT:  Five?

19            MR. CASTLE:  Excuse me.  Exhibit Number 5.  I was

20   thinking tax return of 2010.

21            THE COURT:  2010, yes.

22   Q.    BY MR. CASTLE:  Ms. Auterio, on line 3, what does it

23   show as its gross profits?

24   A.    $24,161,125.

25   Q.    And when it comes to line 21, what does it show as
```

1    ordinary business income?

2    A.    $4,678,060.

3    Q.    When it comes to the Melon Bank account for the

4    beginning of January, 2011 --

5    A.    Uh-huh.

6    Q.    -- do you know how much money was in that account at

7    the beginning?

8    A.    Not off the top of my head, no.  I would have to look

9    at the the statements.

10   Q.    If I said to you about $8 million, would you have any

11   reason to dispute that?

12   A.    I mean, it could have been.

13   Q.    You just don't recall?

14   A.    I don't, no.

15   Q.    So, when it comes to the years 2007, 2008, '9 and '10,

16   American International was a profitable company?

17   A.    Yes.

18   Q.    In fact, every year that you've been associated with

19   American International, it has been a profitable company?

20   A.    Yes.  I mean, we've had ups and downs, but basically we

21   have been profitable.

22   Q.    Meaning that you have always made more money than you

23   have spent?

24   A.    Yes.  That's the plan.

25   Q.    Let me ask you this question.  Based on the

1    circumstances in which American International finds itself,

2    why isn't it willing to borrow money from Bank of America to

3    tie it over during this period of time while it waits for

4    contracts that it might have to advance costs?

5    A.    I'm sorry.  Could you -- I'm not sure what the question

6    was.

7    Q.    Well, let me repeat.  The question I have is, why is it

8    that American International is not willing to borrow on its

9    line of credit with Bank of America to cover costs it might

10   have to advance during this period of time?

11   A.    Well, because, historically, what we've done was use

12   the profits from the previous work to cover our new projects,

13   and that was what the plan was for this, use the profits that

14   we made in the last year to cover our new projects.  So, I

15   mean, technically, we shouldn't need to borrow when we made a

16   profit.

17   Q.    Any money that you receive back, the intent is to spend

18   that money; is that correct?

19   A.    Is to invest in our new projects.

20   Q.    And what you mean by invest in new projects, you mean

21   advance the costs?

22   A.    Correct.

23   Q.    Which means to spend?

24   A.    To spend.

25   Q.    But, as we talked about with Exhibit G, because it

1    appears that though some of these contracts are seasonal,

2    money is -- more money is going to be coming in here in the

3    fall 'til the end of the year kind of a thing?

4    A.    It's not -- it wouldn't even cover the air fare.  The

5    money that's going to come in, we're talking in the couple

6    thousand dollars.  That might cover me flying one guy.  So,

7    if I had all these charters, it's -- you know, and I still

8    have to pay the people that did those charters.

9    Q.    But you anticipate, from these current clients, you're

10   making 50 percent profit?

11   A.    Yes.  That's the plan.

12   Q.    And what you don't know, though, is what prospective

13   clients you're going to have in the future, correct?

14   A.    Correct.

15   Q.    In fact, what we have is, the first three lines for

16   prospective clients involving -- it looks like Iraq?

17   A.    Uh-huh.

18   Q.    They were supposed to start this month?

19   A.    They were this month.

20   Q.    But they haven't, have they?

21   A.    Well, it hasn't started, but I have received e-mails

22   that they have received their paperwork necessary to begin

23   working there and expect it within the next few weeks, so I

24   am pretty confident that that will happen.

25   Q.    But, as you indicated, there is no signed contract?

1    A.     There is no guarantee.  There is no signed contract.

2              MR. CASTLE:   If I could have just a minute, Your

3    Honor?

4              THE COURT:   You may.

5    Q.     BY MR. CASTLE:  Ms. Auterio, just a couple more

6    questions.  Going back to Exhibit F, if we could, for a

7    minute.  What I'd like to do is talk to you about that one

8    you have toward the bottom, for legal and accounting fees, of

9    $18 thousand?

10   A.     Yes.

11   Q.     How much of that is for legal fees, and how much of

12   that is for accounting fees?

13   A.     At the moment, I don't know.  I don't know what my

14   legal fees or accounting fees are.  This was a combined

15   estimate from both, basically combined estimate of going

16   forward.  Obviously, I'm not an accountant, so we are going

17   to need someone to go over our taxes and basically verify

18   anything in QuickBooks and as well as legal fees.  And

19   there's -- I don't really know what the separation margin is.

20             We have, obviously, a local attorney as well as

21   Massachusetts, so our attorneys' fees will be much greater

22   than the accounting.

23   Q.     But haven't you paid some attorneys' fees already

24   related to this case, shortly after the money was seized?

25   A.     Technically, they gave us most of that back to pay

1   payroll and bills.  So, I don't know if any -- I believe

2   there was 8 thousand or so paid to one attorney, and so far

3   that was it.

4   Q.    In fact, some of the legal fees were to pay for an

5   attorney for you?

6   A.    That was the one that was 8 thousand, the only one that

7   I know of that was paid.

8         MR. CASTLE:  I'm sorry, Your Honor, if I could have

9   just one moment.

10  Q.    BY MR. CASTLE:  I'm trying find, Ms. Auterio, the

11  exhibit that talks about how much money you have in --

12  A.    Current accounts?

13  Q.    I believe that is Exhibit E.  Would you turn to that?

14  A.    I have that, yes.

15  Q.    You will notice there it talks about Bank of America?

16  A.    Uh-huh.

17  Q.    Gives the account and the amount.  It also has an entry

18  for the Deutsch Williams client funds account.  It says

19  $62,275.88?

20  A.    Yes.

21  Q.    So that's not an amount of money that's in an account

22  of American International?

23  A.    No.  It's not in our bank account.  No.

24  Q.    That's with Deutsch Williams?

25  A.    Correct.

1   Q.    That's to pay their legal fees?

2   A.    Unless I need it to help pay payroll.  I mean, at the

3   moment, it's there for that.  However, if I was to call and

4   need additional funds to make payroll, that's what the other

5   money they gave back for.

6   Q.    So, it sounds like you have an agreement with Deutsch

7   Williams that goes something like this.  You paid them a

8   retainer of more than $133,000?

9   A.    Uh-huh.

10  Q.    Correct?

11  A.    Correct.

12  Q.    And then, if you need money for payroll, you can call

13  them, and they will pay you what you need for payroll?

14  A.    I hope so.

15  Q.    And that's instead of borrowing on a line of credit?

16  A.    Yes.

17  Q.    Now, you also mentioned something about credit cards.

18  You used credit cards in the past.  Could you explain that

19  again for me?

20  A.    Yes.  We normally use our credit cards, so if I need to

21  fly someone, we call the travel agent, we put the air fare on

22  the credit card.  We also put the hotel -- most hotels, you

23  know, they are not just going to check someone in, so we have

24  to give a credit card authorization for the hotel, whether it

25  be Iraq, Indonesia or wherever.  Any supplies they may need,

1    we will get and we will ship over.  Things like that

2    nature.

3    Q.    Now, going back to Exhibit G -- and not that you have

4    to turn back to Exhibit G. -- but your current clients,

5    wouldn't those be characterized as an asset of the company?

6    A.    I'm sorry?

7    Q.    Your current clients --

8    A.    Uh-huh.

9    Q.    -- and your relationships with them and the anticipated

10   income, wouldn't those be considered an asset of American

11   International?

12   A.    I suppose.

13   Q.    If I could get you to turn, again, to Exhibit 5, which

14   is the tax return for 2010.

15   A.    Okay.

16   Q.    And I'm going to need you to turn to page 4, if you

17   could.

18   A.    Yes.

19   Q.    And if I could -- this is Schedule L.  Can you see that

20   up there on the left-hand top corner?

21   A.    On page 4?

22   Q.    Well, I'm sorry.  It's page 6.

23   A.    Okay.

24   Q.    Do you see at the top where it says Schedule L?

25   A.    Assets.  Yes.

1    Q.     And it says balance sheet per Brooks.  So I'm over here

2    on the left-hand side of this document.

3    A.     End of your tax -- beginning of tax year.  Oh, balance

4    sheet per Brooks -- books.

5    Q.     I'm sorry, books.  Yes.  It has a line there, number 1,

6    for cash.  And it says beginning of tax year, $1,660,381?

7    A.     Yes.

8    Q.     That's column B.  And at the end of the year, it says

9    $5,292,756?

10   A.     I see it.

11   Q.     And then going down to 2A, which is entitled Trade

12   Notes and Accounts Receivable, you see there at the beginning

13   of the tax year, it says the amount is $4,429,831?

14   A.     Uh-huh.

15   Q.     And then, if you go over to end of tax year, it

16   indicates that the trade notes and accounts receivable are

17   $2,000,822 and 900 -- excuse me, $2,822,930?

18   A.     Yes.

19   Q.     Does American International consider an account

20   receivable an asset of American International?

21   A.     Yes.

22          MR. CASTLE:  If I could have just one moment.

23          THE COURT:  Yes.

24          MR. CASTLE:  Your Honor, those are all the

25   questions.

1          THE COURT:  Thank you, Mr. Castle.

2          Any redirect?

3          MR. BROOKS:  Just one question.

4          THE COURT:  I like the sound of that.

5                    REDIRECT EXAMINATION

6     BY MR. BROOKS:

7     Q.    Ms. Auterio --

8     A.    Yes.

9     Q.    -- you said that bills were paid from -- bills for the

10    next year were paid from the profits of the prior year?

11    A.    Yes.

12    Q.    All those profits were in the Melon Bank?

13    A.    Yes.

14          MR. BROOKS:  Thank you.  No further questions.

15          THE COURT:  Thank you.  Any recross?

16          MR. CASTLE:  No, Your Honor.

17          THE COURT:  You may step down, Ms. Auterio.  Thank

18    you.

19          THE WITNESS:  Do I leave these papers here?

20          THE COURT:  Yes.

21          All right, now, what else are we going to do?

22          MR. BROOKS:  Your Honor, we have the accountant,

23    Mr. Schwartz.  It's not my intention at this time to call

24    him.  I hold him in reserve depending on what witnesses, if

25    any, that the government calls.

1          THE COURT:  All right.

2          MR. CASTLE:  Your Honor, we don't intend on calling

3    any witnesses.

4          MR. BROOKS:  Then I don't intend to call

5    Mr. Schwartz.  We rest our matter.

6          THE COURT:  So we're done with the witnesses?

7          MR. BROOKS:  Yes, Your Honor.

8          THE COURT:  Do you want to make a closing argument?

9          MR. BROOKS:  Yes, Your Honor.

10          THE COURT:  Can you do it in 15 minutes or less?

11          MR. BROOKS:  I could do it probably in seven minutes

12    or less.

13          THE COURT: What about you, Mr. Castle or Ms. Weld?

14          MS. WELD:  Yes, Your Honor.

15          THE COURT:  Go ahead.

16          MR. BROOKS:  Your Honor, much of what I said in the

17    beginning of this case, in the beginning of this hearing

18    today, is come to pass.  I think we have established

19    everything we need to do under 983 for the return of the

20    money.  I think the only witness who has testified in this

21    matter has testified, with absolute clarity, that the assets,

22    the -- really, the only asset of American International was

23    seized.

24          The goodwill or the accounts receivable that are

25    alluded to by the government as an asset are only an asset if

1    you can continue conducting business.  Once you cease

2    conducting business, that asset disappears.  And that is

3    what's going happen to American International.

4         It is uncontested now that the monies that they took

5    were monies that were used to capitalize American

6    International.  That has been withdrawn.  They have

7    effectively seized the business.  They have -- they haven't

8    closed it down because it won't be closed down, assuming they

9    don't want any new business, but once that new contract comes

10   in and they no longer have the capability to fund that

11   project, they are effectively out of business for new

12   clients.

13        And, as you can tell, they have a stable of existing

14   clients, but they are not enough to support the

15   infrastructure of this company without promoting and

16   marketing themselves and getting new clients.  That's what

17   the money is for.  That is the model.  Whether it was correct

18   to keep $5.3 million in the account, that's a business

19   judgment.  But that's a judgment that a tax payer, a citizen,

20   who pays all the taxes on this income -- so the government

21   says, "We won't give you your money back, but thanks for

22   paying the taxes."  We really like that.

23        I haven't heard whether they are going to offer to

24   pay back the taxes that we paid on the income, but they will

25   take our money.  Whether the law gives them a right to take

1    the money, the trigger tests in 983 apply, and we have met

2    every standard under that to get that money returned.  They

3    are not what the cases that the government puts in their

4    brief are.

5           This is not a sham operation.  This is a legitimate

6    business, should be treated as a legitimate business.  But

7    their counter argument to that is they are focusing on how

8    much attorneys' fees have to be paid.  Well, attorneys' fees

9    have to be paid because they brought an action.  American

10   International is not going to create money for Deutsch

11   Williams if they don't have to.  They have to because

12   somebody decided they would seize their money and create an

13   underlying criminal Complaint backing up the in rem

14   procedure.

15          They brought this action to bear.  The government is

16   responsible for what they did.  We are simply reacting to

17   what they did.  And we will continue to react to what they

18   did.  But this is a legitimate company, with legitimate

19   business concerns, and it has an absolute right to conduct

20   business like any other business.  And that means you can't

21   take my money, and you can't tell me how to spend my money,

22   and you can't tell me that I can't afford to market new

23   clients because you've taken my capital.

24          Borrow money.  Great.  That's exactly what has

25   gotten this country into trouble.  We borrow money.  Well,

1    they want us to borrow money, and now they say borrow more

2    money.  Don't give me back my money that we earned on a -- I

3    don't care what they say.  This was a contract.  Services

4    were performed.  We did not make an outrageous profit on that

5    contract.  We earned that money.  That money belongs to

6    American International, and it doesn't belong to the United

7    States Government.  We paid the taxes on that.  That's the

8    part that they are entitled to, and they got it.

9           We want it back.  We believe we deserve it back and

10   we believe we have met all the tests that the law puts

11   forward.  Thank you, Your Honor.

12          THE COURT:  Thank you, Mr. Broods.

13          Ms. Weld.

14          MS. WELD:  Thank you.  Well, Your Honor, just to

15   reply to counsel's assertion that they have an absolute right

16   to the money; that, of course, is up to the Court to

17   determine.

18          We have a couple of points to make on some of the

19   exhibits that have been provided, and I think that the

20   evidence does establish what both of us indicated, promised

21   to you this morning at 9:00 o'clock, that it would.  And that

22   is that the doors are still open with the company.  They are

23   suffering some hardship, but the company has not been

24   rendered dysfunctional or unfunctional or unable to function.

25          They are historically a profitable company.  They

1    were quite flush with cash during the years of the Afghan

2    contract, which made up a good bit of their business.  But,

3    as Ms. Auterio indicated, they were able to take out some

4    borrowing for advance expenses when that contract began.  The

5    money that was left over, which the government seized

6    pursuant to the warrant, was money that was essentially the

7    profit and was actually a reduced amount of profit that was

8    made largely from that Afghan contract.

9         Should the money be released at this point in time,

10   it will be spent.  There is no offer of surety or any other

11   substitute res to cover any currency that would be released,

12   and we would be unable to restrain any other assets of the

13   corporation going forward into trial in this matter.

14        Obviously there can be a trial.  If AISC prevails,

15   the funds would be released with the accrued interest at that

16   time.

17        I just want to point out a couple of the problems

18   that we have with a few of the exhibits and some of the

19   testimony.  As you know, Your Honor, the cases do very, very

20   clearly say that funds should not be released under 983 (f)

21   under a hardship provision; that is, for attorneys' fees.

22   Attorneys' fees are included in the budget that had been

23   given to the Court, of $18 thousand a month.

24        The purpose, as Ms. Auterio said, has to do with the

25   litigation expenses of this case, not as to the ongoing

1  expenses that the company would incur with regard to engaging

2  in contracts or legal maneuvers that might require legal

3  services.  So, according to the evidence that the company has

4  given you, those attorney -- that money is factored into the

5  monthly budget.

6       The other item, of course, would go to the CEO

7  Mr. Taylor of roughly 20 thousand a month, which should not

8  really be distributed, and I think Ms. Auterio indicated

9  this, until all of the other expenditures of the company for

10  that month have been taken care of.  So, in other words, you

11  cannot operate at a loss and also make Subchapter S

12  distributions.

13       They have made the point that they are operating at

14  a loss now.  We don't really -- well, I take that back.  I

15  think that the position of the company and the government is

16  that they are keeping their heads above water, they are

17  operating at a profit.  It's not a large profit, but if you

18  take their own figures of 226 thousand or so a month,

19  averaged out for income stream.  They still have an income

20  stream, according to their own figures, the monthly budget of

21  $206 thousand.

22       And if you back out the amount for attorneys fees

23  and you back out some of the Subchapter S Corporation, they

24  have sufficient funds, Your Honor, that are being received

25  now to build up a capital reserve that can then partially be

1    used in connection with some borrowing, as was done in 2007

2    on the Department of Defense contract, to meet the advance

3    costs of the additional contracts that are expected.

4         And, as Ms. Auterio said, those costs are reimbursed

5    at a profit margin of about 50 percent once those contracts

6    go into place.  We cannot seize those additional profits in

7    the future, the forfeiture in this matter, in this

8    litigation, as proceeds of the underlying Department of

9    Defense contract.  We have an obligation, Your Honor, to have

10   gone forward with that seizure, to obtain what we can from

11   this company and also the other alleged co-conspirators in

12   this case, for restitution to the Department of Treasury,

13   for the $50 million that the contract itself was valued at.

14        And, again, if these parties do prevail on the

15   merits of the case, the assets would be released to them, but

16   this company was the essential vehicle through which those

17   funds were paid and deposited.  It started as a small

18   contract and then it grew.  This company is also the vehicle

19   through which the approximately 30 percent of the entire

20   contract went to Mr. Harris, who we still don't really know

21   what all he did, but AISC was paying Mr. Harris.

22        So, on the law and also on the evidence that you've

23   received, we would first argue that they have not shown that

24   the company itself has been seized, which is required by the

25   case law, and that even on the facts of the case, under the

1    hardship provisions of 983 (f)(1)(C) and (D), they certainly

2    have not shown that the hardship caused to the company is

3    greater than the risk that the funds, once they are released,

4    whatever amount, would be spent.

5         And, Judge, they haven't even given you a number as

6    to what would be needed to keep the doors open.  Exhibit I is

7    a very fluctuating kind of mushy sort of estimation.  I can

8    see that it is a little difficult to forecast some of the

9    expenditures, but they have not given a number as to what

10   would be needed.

11        And also Exhibit, I believe it's E, that shows the

12   current assets of the company, does not include the hundred

13   thousand that was released by the Court and the hundred

14   thousand that's still owed to the company by the vendor that

15   Ms. Auterio spoke of.  So, we would ask you, based on the law

16   and on the facts to deny the hardship petition.  We believe

17   that the law simply doesn't permit any release at this point

18   in time without a substitute res in property, which has not

19   been proposed.

20        And we thank you very much for the opportunity to --

21   I thank you for the opportunity to appear pro hac vice.

22        THE COURT:  Thank you.

23        A brief reply?  You don't need to if you've said

24   everything you want to say.

25        MR. BROOKS:  Yes, Your Honor.  Just one point.

```
 1   Ms. Weld alluded to it.  I don't see the government has made

 2   any proof that the hardship to the government outweighs the

 3   hardship to American International Security.  There has been

 4   no evidence to support that.

 5          Thank you, Your Honor.

 6          THE COURT:  Thank you.  And I'll take this matter

 7   under advisement and get a ruling out as quickly as I can.

 8   I know that time matters in these kinds of things.  Thank you

 9   all.  We'll be in recess

10          MR. BROOKS:  Thank you, Your Honor.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25          (Whereupon the proceedings were concluded.)
```

1
2                        REPORTER'S CERTIFICATE
3    STATE OF UTAH              )
4                              ) ss.
5    COUNTY OF SALT LAKE        )
6
7            I, REBECCA JANKE, do hereby certify that I am a
8    Certified Court Reporter for the State of Utah;
9            That as such Reporter I attended the hearing of the
10   foregoing matter on October 7, 2011, and thereat reported in
11   Stenotype all of the testimony and proceedings had, and
12   caused said notes to be transcribed into typewriting, and the
13   foregoing pages numbered 1 through 115 constitute a full,
14   true and correct record of the proceedings transcribed.
15           That I am not of kin to any of the parties and have
16   no interest in the outcome of the matter;
17           And hereby set my hand and seal this 10th day of
18   January, 2012.
19
20
21
22
23
24           _____
25                        REBECCA JANKE, CSR, RPR, RMR